DAVIS ET AL. v. YATES ET AL.

[No. 27,495. Filed March 4, 1941. Rehearing denied March 31, 1941.]

*Stanley E. Stohr* and *Aikman, Miller & Causey,* all of Terre Haute, for appellants.

*Kessinger, Hill & Aterburn,* of Vincennes, for appellees.

FANSLER, J.—This is an appeal from an interlocutory order enjoining the appellants from picketing a coal mine. The appellants and appellees are all coal miners.

The facts are not in dispute. Prior to August, 1939, some of the appellants and some of the appellees worked in the mine owned by the Richardson and May Coal and Mining Corporation. They were then members of the union known as the United Mine Workers of America, and, apparently, the wages and working conditions in the mine conformed to the union requirements. In August, 1939, the appellants and the appellees entered into a contract with the mine owner in which the owner

was termed the lessor and the workmen lessees. The owner was to receive a flat price per ton for coal mined. The president of the owner company and one of its employees were to be employed as mine superintendent and top boss at a flat wage per day. Other operating expenses were to be paid, and the residue of the price procured for the coal sold was to be apportioned among the workmen. This contract conflicted with union standards, and the union miners who worked under it were required to sever their connection with the union. The contract went into effect in August, 1939, and the appellants and appellees worked under it until August, 1940, when it was terminated. Upon the termination of the contract, the appellants and some of the appellees met for the purpose of discussing the organization of a local union, and they did organize under the jurisdiction of the United Mine Workers of America. They thereupon undertook to reach an agreement with the owner of the mine for employment in the mine, which was temporarily closed down, at the union wage scale. On August 26, 1940, a picket line was established by the appellants, as members of the union, in aid of their effort to procure employment at a union wage scale. This picket line continued when there was activity at the mine, until approximately the time of the hearing on the petition for a temporary injunction. Some time between August 23, 1940, and November 12, 1940, the appellees, who were not members of the union, negotiated a new lease-agreement, similar to the one above referred to, with the mine owner, and on November 12, 1940, began working in the mine and operating it under this agreement. The picketing continued, with signs or placards upon which appeared "Unfair to Organized Labor," "Be Fair," and "We Want Fairness." The mine was what is known as a wagon mine, which sold

its output to trucks which came to the mine. The signs were displayed to approaching truck drivers. An effort was made to persuade the drivers to go to other mines. There is no showing of force or violence in the picketing. There is evidence that pickets stood in the driveway and endeavored to persuade trucks to go away, but not of any threat of force. The number of pickets varied from 2 to 15 or 20. There is nothing to indicate an attempt at intimidation by mass picketing. On the contrary, the evidence discloses that the pickets were courteous and merely solicitous and not threatening in their attitude.

It is clear that the appellants desired employment in the mine at the union wage scale; that they considered the mine owner unfair for not paying union wages; and that they considered the contract under which the mine was being operated as unfair to labor.

In the recent cases of *Milk Wagon Drivers' Union of Chicago, etc., et al.* v. *Meadowmoor Dairies, Inc.*, 312 U. S. 287, and *American Federation of Labor et al.* v. *Swing et al.*, 312 U. S. 321, decided by the United States Supreme Court on February 10, 1941, the court has clearly and definitely declared that the right to picket involves the right of free speech guaranteed by the Federal Constitution, and that in cases involving picketing state courts must act in subordination to the jurisdiction of the Supreme Court of the United States to enforce constitutional liberties. The decisions of the Supreme Court of the United States are controlling, and we construe the opinions in the cases cited as clearly in point. The first case involved picketing by a milk wagon drivers' union. The dairy company sold milk to vendors, who operated their own trucks, to resell to retailers. These vendors departed from the working standards theretofore achieved by the union for

its members as employees of the dairies. The union, in order to compel observance of its standards, picketed the dairies. It appears that the judgment enjoining the picketing was affirmed only because of violence involved. The other case involved picketing of a beauty parlor by a union. The employees of the beauty parlor did not belong to the union and did not desire to belong, although they were free to do so in so far as their employer was concerned. The union members and the picketers never had been employees of the establishment. There was no question of violence, and the question of the truthfulness of the placards carried by the picketers was held not to be involved. There was a judgment by the courts of Illinois enjoining the picketing. This judgment was reversed. We quote the following from the opinion:

"All that we have before us, then, is an instance of 'peaceful persuasion' disentangled from violence and free from 'picketing *en masse* or otherwise conducted' so as to occasion 'imminent and aggravated danger.' *Thornhill* v. *Alabama,* 310 U. S. 88, 105. We are asked to sustain a decree which for purposes of this case asserts as the common law of a state that there can be no 'peaceful picketing or peaceful persuasion' in relation to any dispute between an employer and a trade union unless the employer's own employees are in controversy with him.

"Such a ban of free communication is inconsistent with the guarantee of freedom of speech. That a state has ample power to regulate the local problems thrown up by modern industry and to preserve the peace is axiomatic. But not even these essential powers are unfettered by the requirements of the Bill of Rights. The scope of the Fourteenth Amendment is not confined by the notion of a particular state regarding the

wise limits of an injunction in an industrial dispute, whether those limits be defined by statute or by the judicial organ of the state. A state cannot exclude workingmen from peacefully exercising the right of free communication by drawing the circle of economic competition between employers and workers so small as to contain only an employer and those directly employed by him. The interdependence of economic interest of all engaged in the same industry has become a commonplace. *American Foundries* v. *Tri-City Council*, 257 U. S. 184, 209. The right of free communication cannot therefore be mutilated by denying it to workers, in a dispute with an employer, even though they are not in his employ. Communication by such employees of the facts of a dispute, deemed by them to be relevant to their interests, can no more be barred because of concern for the economic interests against which they are seeking to enlist public opinion than could the utterance protected in *Thornhill's* case. 'Members of a union might, without special statutory authorization by a State, make known the facts of a labor dispute, for freedom of speech is guaranteed by the Federal Constitution.' *Senn* v. *Tile Layers Union*, 301 U. S. 468, 478."

Appellees contend that the signs used by the picketers are untrue. This is based upon the contention that the appellees were operating the mine and that they were not unfair to union labor. But this contention ignores the actualities. There was a labor dispute between the appellants and the owner of the mine before the appellees made their so-called lease-contract, and it seems that the union considers the operation of the mine by workmen eligible to become members of the union under a contract such as we have

370

here to be in itself unfair and inimical to the best interests of union labor.

The decisions above referred to require that the judgment be reversed, with instructions to dissolve the temporary injunction.

Judgment reversed.

NOTE.—Reported in 32 N. E. (2d) 86.