DONALD PETERS, ET AL. *v.* POOR SISTERS OF SAINT FRANCIS.

[No. 570A77. Filed March 16, 1971. Transfer denied November 9, 1971.]

*Marvin Gittler, Lee M. Burkey, Asher, Greenfield, Gubbins & Segal,* of Chicago, Illinois, *Donald L. Gray, Sullivan & Gray,* of Whiting, for appellants.

*Galvin, Galvin & Leeney,* of Hammond, *Seyfarth, Shaw, Fairweather & Geraldson,* of Chicago, Illinois, for appellees, *William S. Hall,* of Indianapolis, attorney for Amicus Curiae, The Indiana Hospital Association.

SHARP, J.—This action was commenced by the filing of a complaint by the Saint Margaret Hospital, hereinafter referred to as Hospital, seeking a temporary restraining order and injunction against the Hospital Employees' Labor Pro-

gram ("Help"), hereinafter referred to as Union. The complaint sought to enjoin the Union from calling, instigating or participating in any strike or work stoppage by or among the Hospital's employees. The complaint also sought to enjoin any picketing by the Union which had the purpose or effect of interfering with the normal operation of the Hospital.

On October 14, 1969, the trial court entered its order, which reads in the pertinent parts as follows:

"This cause having been submitted on Plaintiff's verified complaint for a permanent injunction against the Defendants, and Defendants' verified answer in four paragraphs, and the Court having heard evidence and said evidence having been concluded, arguments of counsel in open court, and having read briefs submitted by counsel, and having considered Defendants' consolidated motions to set aside submission and reopen the cause and motion for production of records, does now overrule said motions, and having determined that Indiana's 'Little Norris-LaGuardia Act', also known as the Anti-Injunction Statute, the same being Burns Indiana Statutes Annotated, Section 40-501 et seq., is inapplicable to this case, and being duly advised in the premises now finds for Plaintiff on its complaint and against the defendants on their answer.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED by the Court, that the Defendants, Donald Peters, John A. Coleman, Harry Kurshenbaum, Charles Ware and Jeanne Smith, individually and as agents and representatives of a class composing an unincorporated association, known as the Hospital Employees' Labor Program: and Defendants Annie Harris, Inez Keys, Paula West, Jean Frystak, Lavastine Hart, Emma Jean Prior, and Lorraine Hodge, individually, and as agents and representatives of the aforesaid class composing the association, and as members and representatives of a class of certain non-professional employees of Saint Margaret Hospital; John Doe and Other Unknown Persons acting in concert with them, be and hereby are permanently enjoined from the following acts and conduct:

1. Calling, fomenting, instigating, directing, encouraging, causing, assisting, or participating in any strike or work stoppage, by and among any of plaintiff's employees.

2. Picketing or causing picketing in and about the vicinity of Plaintiff's premises at 25 Douglas Street, Ham-

mond, Indiana, for the purpose or with the effect of calling, fomenting, instigating, directing, encouraging, causing, assisting, or participating in any strike or work stoppage by and among any of plaintiff's employees, or with the purpose or effect of interfering with or disrupting the normal operations and activities of plaintiff's Hospital.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED by the Court that a copy of this injunction order under the hand of the Clerk and the seal of this Court shall be delivered forthwith to the Sheriff of Lake County for service upon the defendants, Donald Peters, John A. Coleman, Harry Kurshenbaum, Charles Ware, Jeanne Smith, Annie Harris, Inez Keys, Paula West, Jean Frystak, Lavastine Hart, Emma Jean Prior, Lorraine Hodge, and the Sheriff is hereby directed to enforce the terms of this order upon defendants."

On November 12, 1969, defendants filed their Motion for a New Trial, omitting formal parts and signatures, alleging:

"1.   Irregularity in the proceedings of the court by which the defendants were prevented from having a fair trial in this cause, to-wit:

(a)   The court erred in not ruling on defendants' motion for directed verdict at the conclusion of the evidence.

(b)   The court erred in rendering judgment against defendants without affording defendants the opportunity of a hearing on the question of the adequacy of the plaintiff's bond.

(c)   The court erred in overruling defendants' consolidated motion to set aside submission and reopen cause and motion for production of records of plaintiff corporation.

2.   The court erred in its conclusion that the Indiana 'Little Norris-LaGuardia Act,' also known as the Anti-Injunction Statute, the same being Burns Indiana Statutes Annotated, Section 40-501 et seq., is inapplicable to this case.

3.   The decision of the court is not sustained by the evidence.

4.   The decision of the court is contrary to law.

5.   The court erred, after the court on its own motion requested the parties to submit special findings of fact and conclusions of law for the court's consideration, by failing

to make such special findings of fact and conclusions of law in accordance with Indiana Supreme Court Rule, 1-7b.

6. The court erred in rendering judgment against defendants by failing to follow the provisions of Burns Indiana Statutes 40-507 which require specific findings of fact by the court as to each of the matters outlined in the Statute under sub-paragraphs (a) (b) (c) (d) and (e) thereof."

On April 16, 1970, the trial court modified its order of October 14, 1969, to provide as follows:

"The Court further finds that the administrators of Plaintiff hospital have been refusing to meet with those employees requesting union representation; that it was not the intent of this Court by the entry of the order of October 14, 1969 to prevent any employee from selecting his bargaining representative, and it being the declared public policy of this state that employees be encouraged to select a bargaining representative of his own choosing; the Court now on its own motion orders that a secret ballot election be held to determine whether the non-professional employees of said Plaintiff hospital desire to have union representation, and said election is ordered held within 60 days of this order. The parties and/or their attorneys are ordered to submit to the Court their proposals for the conduct of such election within 20 days.

The Court will thereafter enter an order fixing the date and procedure to be followed for said election."

On May 8, 1970, the trial court modified its order of April 16, 1970, to provide as follows:

"The order of April 16th is now modified to require the Plaintiff to offer employment to all those who were employees of the Plaintiff on March 31st, and who were not working on April the 16th, by June the 15th, 1970.

Plaintiff is further given ten days additional time within which to file the proposal for the conduct of the election. Said election will be held within ten days after June the 15th.

Plaintiff's motion to stay certain portions of the order of April 16, 1970 is denied with leave to refile upon a showing by June 15 that all employees have been offered employment under the terms of this order."

This case in reality involves cross-appeals. The Union generally contends that the injunction entered on October 14, 1969, is invalid. The hospital generally asserts that the orders of modification of April 16, 1970 and May 8, 1970, which pertain to the retention of employees and the election are invalid.

We will consider the assertions of the Hospital in regard to the retention and election order first.

In *Blackburn* v. *Koehler,* 127 Ind. App. 397, 403, 140 N. E. 2d 763 (1957), this court, in construing an order which provided "the restraining order will be extended as a temporary injunction until the election is held", stated that:

> "The parties have not directed our attention to, nor have we discovered, any provision in the Indiana Labor Anti-Injunction Statute, or any other statutory authority in Indiana, which grants to a trial court the power of jurisdiction to include in a temporary injunction the jurisdiction to order and direct the parties involved to hold an election."

The Union relies on Burns' Indiana Statutes Annotated § 40-2808:

> "No worker or group of workers who have a legal residence in the state of Indiana shall be denied the right to select his or their bargaining representative in this state, or be denied the right to organize into a local union or association to exist within and pursuant to the laws of the state of Indiana: Provided, That this act shall in no way be deemed to amend or repeal any of the provisions of the National Labor Relations Act."

In regard to this statute Professor Getman states:

> "At first reading this appears to be a significant statute. The right of employees to select a bargaining representative seems to imply that management is required to recognize and bargain with a properly chosen union. But careful reading of the statute indicates that it was not meant to impose a duty on employers to bargain collectively. The title and language of the statute suggest that its primary purpose was to permit the formation of local unions and that the legislature intended to prevent undue control by

national unions over local members. This interpretation is supported by such unofficial legislative history as can be found, and by the absence of a remedy for violation or provision for determining questions of majority choice. Even the unnecessary reference to the NLRA suggests an attempt to regulate union internal organization rather than collective bargaining." 42 Ind. Law Journal, p. 87.

There has been no cases cited or found which purport to interpret Burns' § 40-2802. We do not believe its legislative purpose or provisions are broad enough to validate the action of the trial court on April 16, 1970 and May 8, 1970 in this case.

The decisions of this court and our Supreme Court above cited are bolstered by the decisions of other jurisdictions. In *Petri Cleaners, Inc.* v. *Automotive Employees, etc.*, 2 Cal. Rep. 470, 349 P. 2d 76, 87 (1960), Justice Traynor speaking for a majority of the Supreme Court of California, stated:

"It is for the Legislature to determine whether voluntary bargaining should now be displaced by a rule compelling the employer to bargain with the representatives of a majority of his employees. Recognizing that trial courts are hardly labor relations boards, defendant requests affirmative relief, avowedly because the record is so clear as to raise only issues of law. But, as the United States Supreme Court observed of a similar argument, 'we write not only for this case and this day alone, but for this type of case.' Carroll v. Lanza, 349 U. S. 408, 413, 75 S. Ct. 804, 807, 99 L. Ed. 1183. A host of problems attend compulsory bargaining that only the Legislature can resolve. What constitutes an appropriate bargaining unit? See §§ 8 (a) (3) (i) ; 9 (b) ; 29 U.S.C.A. §§ 158, 159. How is the majority's choice to be determined? See § 9 (c) (1) ; 29 U.S.C.A. § 159. Which employees constitute the relevant majority, those presently employed or those employed at the time the employer's refusal to bargain precipitated the strike? Congress recently changed the federal definition of the relevant majority. The Labor Management Relations Act of 1947 provided that 'Employees on strike who are not entitled to reinstatement shall not be eligible to vote.' § 9 (c) (3) ; 29 U.S.C.A. § 159. Dissatisfaction with this rule (see e.g., Right to Vote During an Economic Strike, 16 U. of Chi. L. Rev. 537) led to the 1959 provision that 'Employees engaged in an economic

strike who are not entitled to reinstatement shall be eligible to vote under such regulations as the Board shall find are consistent with the purposes and provisions of this Act in any election conducted within twelve months after the commencement of the strike.' Labor-Management Reporting and Disclosure Act of 1959, § 702. The enforcement of the duty to bargain under the federal act has been practicable only because the necessary administrative machinery and statutory guides have been provided. This court cannot usurp legislative power by enacting rules of law patterned on the Labor Management Relations Act, and it cannot create the administrative machinery necessary to make such rules workable."

To the same effect see *Peters* v. *South Chicago Community Hospital,* 92 Ill. App. 2d 37, 235 N. E. 2d 842, 846 (1968) in which that court stated:

"Courts may not formulate labor rules or policies when the legislature has failed to do so. The consequences of such action would be far reaching indeed and would convert our courts into labor boards sitting to settle any dispute that arose between the employees' representatives and the employer. . . .

\* \* \*

The (lower) court in the instant case took upon itself the burden of legislating rights and duties of the parties in the field of labor relations. The absence of any statutory or common law duty on the part of the hospitals to engage in collective bargaining with the representatives chosen by their employees negates, as well, any requirement of their participation in negotiations, regarding the employees' desire to join a union, or any other question of representation. The court clearly exceeded the scope of judicial authority." (parenthesis added)

In the same vein the United States Court of Appeals for the 7th Circuit stated in *Indianapolis Education Ass'n* v. *Lewallen* (1969):

"The gravamen of the complaint goes to the failure on the part of the defendants-appellants to bargain collectively in good faith. But there is no constitutional duty to bargain collectively with an exclusive bargaining agent. *Such duty, when imposed, is imposed by statute.* The refusal of the de-

fendants-appellants to bargain in good faith does not equal a constitutional violation of plaintiffs-appellees' positive rights of association, free speech, petition, equal protection, or due process. . . ." (emphasis added)

Thus it is very clear that the trial court's orders of April 16, 1970 and May 8, 1970 were erroneous and should be reversed.

The Union argues that the original injunction issued on October 14, 1969, is invalid. The Union asserts that this dispute is a "labor dispute" within the meaning of that term as used in Acts 1933, ch. 12, as found in Burns' Indiana Statutes Annotated § 40-501 through § 40-514, known as the Indiana Anti-Injunction Statute or the Little Norris-LaGuardia Act. Pertinent parts of the Indiana Anti-Injunction Statute are as follows:

"Section 40-501. No court of the state of Indiana as herein defined, shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this act (40-501—40-514) ; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this act.

Sec. 40-513. When used in this act (Secs. 40-501—40-514), and for the purpose of this act:

(a) A case shall be held to involve or grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interest therein; or who are employees of the same employer; or who are members of the same or an affiliated organization of employers or employees; whether such dispute is (1) between one or more employers or associations of employers and one or more employees or association of employees; (2) between one or more employers or association of employers; (3) between one or more employees or association of employees and one or more employees or association of employees; or when the case involves any conflicting or competing interests in a 'labor dispute' (as hereinafter defined) of 'persons participating or interested' therein (as hereinafter defined).

\* \* \*

(c)    The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.

Sec. 40-509. No restraining order or temporary or permanent injunction shall be granted in a case involving or growing out of a labor dispute, except on the basis of finding of facts made and filed by the court in the records of the case prior to the issuance of such restraining order or injunction; and every restraining order of injunction granted in a case involving or growing out of a labor dispute shall include only a prohibition of such specific act or acts as may be expressly complained of in the bill of complaint or petition filed in such case and as shall be expressly included in said findings of fact made and filed by the court as provided herein."

One of the critical questions raised by the Hospital is whether this is a "labor dispute" within the meaning of Burns' § 40-513 (c). In *Local Union No. 135* v. *Merchandise Warehouse Co., Inc.*, 127 Ind. App. 57, 132 N. E. 2d 715, 717, this court stated:

"* * * a union's attempt to organize a group of employees and the unwillingness of such employees to be organized constitute a labor dispute."

Set also, *Blackburn* v. *Koehler*, 127 Ind. App. 397, 140 N. E. 2d 763. Judge Givan's comments on rehearing in *Anderson Fed. of Teach.* v. *School City of Anderson, et al.*, 252 Ind. 558, 254 N. E. 2d 329 (1970) would certainly indicate that the controversy is a "labor dispute."

Without belaboring the point unduly we believe that the record in this case inescapably leads to the conclusion that the within controversy is a "labor dispute" within the meaning of that term in the Anti-Injunction Statute in that it is a controversy concerning terms or conditions of employment. Therefore, we hold that the within controversy in a labor dispute within the meaning of said Act. See also *Fair Share*

*Organization* v. *Kroger Co.,* 240 Ind. 461, 165 N. E. 2d 606 (1960) and *Fair Share Organization* v. *Mitnick,* 134 Ind. App. 675, 188 N. E. 2d 840 (1963).

Assuming that this controversy is a labor dispute within the meaning of said Act we must consider whether or not the injunction in this case was issued in a procedural manner consistent with the Act and particularly consistent with Burns' § 40-509. The record discloses that on September 30, 1969 the Hospital filed its proposed Special Findings of Fact and that on October 7, 1969 the Union filed its proposed Special Findings of Fact with the trial court. However, the record fails to disclose that the trial judge made any Findings of Fact as contemplated in Burns' § 40-509. On November 18, 1970, this court ordered the trial court to file and submit Special Findings of Fact which the trial court did. However, the Findings of Fact filed by the trial court pursuant to this court's order of November 18, 1970, were purely advisory to this court and do not fulfill the requirements for a special findings found in Burns' § 40-509. In *Weist* v. *Dirks,* 215 Ind. 568, 571, 20 N. E. 2d 969 (1939), our Supreme Court stated:

> "If the case involves a labor dispute it was error to refuse to find the facts specifically."

Further, this court, in *Bartenders, etc.* v. *Clark Restaurants, Inc.,* 122 Ind. App. 165, 172, 102 N. E. 2d 220 (1951), held that:

> "In our opinion the legislative intent in enacting the above quoted provision [40-509] of the statute was to appraise the defendant of the causes which made it necessary to issue the restraining order or injunction."

Also, in *Blackburn* v. *Koehler, supra,* at 127 Ind. App., page 402, this court stated:

> "As shown, the record in the case before us affirmatively shows that the trial court issued a restraining order and granted a temporary injunction without making findings of fact in either said restraining order or the temporary

injunction prior to the issuance of the order granting the temporary injunction, notwithstanding the provisions of the Legislative act above-referred to [40-509]. We believe this was error."

More recently in *Teamsters Local 297* v. *Air-Flow Sheet Metal, Inc.,* 143 Ind. App. 322, 240 N. E. 2d 830 (1968), this court, speaking through Judge Bierly, stated at page 836:

"Section 8 of the Norris-LaGuardia Act, and Sections 1, 7, and 9, of the Acts of Indiana General Assembly of 1933, Chapter 12, p. 28, and Burns' 40-501, 40-507 and 40-509, respectively, are very specific, clear and definite in requiring a trial court to make findings of fact, require a bond, and must enjoin only specific act or acts as set forth in findings of fact, when there is a proceeding for a temporary injunction in a labor dispute."

Likewise, the failure to make such findings was erroneous in this case and the error was not cured retroactively in this case by the trial court's compliance with our order of November 18, 1970.

It would be possible for us to remand this case for a new trial at this point without further discussion of the issues which have been raised by the parties. However, since the case must be remanded for retrial it would be unfair to the parties and the trial court not to discuss the essential issues which have been raised on the merits of this case.

The most fundamental question raised on the merits is whether or not a charitable not-for-profit hospital was intended by the General Assembly to be included within the provisions of the Indiana Anti-Injunction Statute. That statute which was passed by the Indiana General Assembly in the 1933 Session and the Federal Norris-LaGuardia Act which was passed by the United States Congress in 1932 are identical. Neither contained any specific exclusion of charitable not-for-profit hospitals. However, in 1947 in enacting the so-called Taft-Hartley Act the United States Congress amended

§ 152-2 of the National Labor Relations Act by specifically stating that:

"The term 'employer' * * * shall not include * * * any corporation or association operating a hospital, if no part of the net earnings inures to the benefit of any private shareholder or individual, * * *" 29 U.S.C.A., § 152-2.

The action of Congress in 1947 was undoubtedly influenced by the decision of the United States Court of Appeals for the District of Columbia in *National Labor Relations Board* v. *Central Dispensary and Emergency Hospital*, 79 U.S. App. D.C. 274, 145 F. 2d 852, cert. den., 324 U. S. 847, 65 S. Ct. 684, 89 L. Ed. 1408 (1945), which had held that a charitable hospital was within the National Labor Relations Act. The United States Court of Appeals for the District of Columbia held that a charitable hospital was within the meaning of the National Labor Relations Act notwithstanding the decisions in Pennsylvania and New York which had interpreted their states' counterparts of the Norris-LaGuardia Act to exclude charitable hospitals. See *Western Pennsylvania Hospital* v. *Lichliter*, 340 Pa. 382, 17 A. 2d 206 (1941) and *Jewish Hospital of Brooklyn* v. *Doe, et al.*, 252 App. Div. 581, 300 N.Y.S. 1111 (1937).

In *Peters* v. *South Chicago Community Hospital*, 44 Ill. 2d 22, 253 N. E. 2d 375, 378 (1969), the Supreme Court of Illinois stated:

"However, the Anti-Injunction Act provides: 'No restraining order or injunction shall be granted by any court of this State, * * * in any case involving or growing out of a dispute concerning terms or conditions of employment, * * *.' (Ill. Rev. Stat. 1967, ch. 48, par. 2a.) The language of the statute is clear and it makes no exceptions for hospitals. This is the only legislative expression or public policy which touches on the labor relations of these not-for-profit hospitals. As we have mentioned, the General Assembly has failed to enact legislation which would govern these labor relations otherwise than as expressed in the anti-injunction statute.

* * *

For the foregoing reasons, we hold that hospitals are not exempt from the Anti-Injunction Act and that the legislature must grant such exemption if it is to be granted. . . ."

It is quite appropriate that we should look to the Illinois Anti-Injunction Statute and its interpretation for guidance in this case since that is precisely what our Supreme Court did in *Local Union No. 26* v. *City of Kokomo,* 211 Ind. 72, 5 N. E. 2d 624 (1937).

The reasoning and result achieved by the Supreme Court of Illinois in Peters, supra, is expanded upon by the Supreme Court of Utah in *Utah Labor Relations Board* v. *Utah Valley Hospital,* 120 Utah 463, 470, 235 P. 2d 520 (1951), where it stated:

"Congress having disclaimed control of charitable hospitals, the State law exists unhampered by any conflicting Federal act. This brings us to a consideration of defendant's last objection; that because it is a charitable hospital it should be excluded from operation of the Utah Labor Relations Act.

\*     \*     \*

The Hospital concedes that there is no express exemptions relating to such hospitals in the definition of the term 'employer' set forth in Section 49-1-10(2), Ch. 66, Laws of Utah 1947. As a matter of fact, the definition is identical with that contained in the Federal act prior to the 1947 amendment, which was held in the case of N.L.R.B. v. Central Dispensary, etc., supra, to include such charitable hospitals.

Defendant cites and relies on Western Pa. Hospital v. Lichliter, 340 Pa. 382, 17 A. 2d 206, 132 A. L. R. 1146; St. Lukes Hospital v. Labor Relations Comm., 320 Mass. 467, 70 N. E. 2d 10; and Jewish Hospital of Brooklyn v. Doe, 252 App. Div. 581, 300 N. Y. S. 1111, 1119. In those cases, the courts held that charitable hospitals were not meant to be included within the respective state labor relations acts upon the ground that looking to the history and purpose of the acts, even though they were not expressly excepted, a fair interpretation thereof leads to the conclusion that the legislatures of those states did not intend to include non-profit charitable hospitals within their provisions. In the latter case, the New York court observed, 'We

believe it is not open to doubt that the Legislature did not intend the statute to be applicable to such institutions even though it did not expressly exempt them. * * * A case may be within the letter of the law, and yet not within the intent of the lawmakers; and in such case a limitation or exception must be implied.' In the later Pennsylvania case of Petition of Salvation Army, 349 Pa. 105, 36 A. 2d 479, that court reiterated its position and noted that the Legislature and met twice since the first decision and had not seen fit to change the law as interpreted by the court that charitable hospitals were not included. These cases call attention to the fact that labor relations legislation is purposed to prevent imposition on labor and to assist it in bargaining with employers over the products and profits of their labors. They point out that the charitable hospital has no such profits to bargain with; they also refer to the vital character of the service rendered by hospitals and the necessity of uninterrupted service where people's health and lives are at hazard and the dire consequences that might result if strikes or other labor disturbances occurred.

The reasoning of the cases relied upon by the defendants seems to be largely to the effect that it would have been a good idea for the Labor Relations Act to except said charitable hospitals and therefore the courts should imply such an exception.

The other line of authority was followed and is relied upon by the Utah Board; N.L.R.B. v. Cent. Disp. & Emergency Hospital, supra; Northwestern Hospital v. Pub. Bldg. Service Employees' Union, Local No. 113, 208 Minn. 389, 294 N. W. 215; Wis. Emp. Rel. Bd. v. Evangelical Deaconess Society, 242 Wis. 78, 7 N. W. 2d 590.

These cases point out that the purpose of the act and the function of the Labor Board is to minimize strikes and strife in labor relations; that for the hospital not to be subject to control would give no assurance that there would be no strike or other labor disturbance. The court in the Wisconsin case just referred to says in substance that the principal purpose of the act is to safeguard the interest of the three groups concerned with labor relations, that is, the public, the employer, and the employee; that instead of promoting strikes the real purpose of the act is to provide new methods of peacefully settling disputes which may arise and thus prevent strikes, and that there can be no greater hazard to the lives of patients in the hospital under the statute than there was before its enactment. Labor and sweat, hours, wages, and the desire to be important as individuals

are much the same whether they exist in a charitable hospital or an industrial plant. There seems to be no reason why the position and rights of workers in a hospital are not just as important to the well being of the whole community as those of any other employees.

In the Northwestern Hospital case, supra, the Minnesota court said: 'The Labor Relations Act does not make the right to bargain collectively dependent upon the nature of the employer's operations. * * * Since the legislature specified certain exemptions, the most practical inference is that all intended were mentioned. Inasmuch as hospitals and hospital employees were not specifically excluded, they must be regarded as within the definitions.' [208 Minn. 389, 294 N. W. 218.] With this thought, we are in accord. The Utah act also contains some exceptions but the Legislature did not see fit to except charitable hospitals. We therefore assume they were intended to be covered."

We believe that the reasoning and result in the *N.L.R.B.* v. *Cent. Disp.*, supra, *Utah Valley Hospital*, supra, and *Peters*, supra, are relevant in the interpretation of the Indiana Anti-Injunction Act. Since the Indiana General Assembly has not seen fit to specifically exempt charitable hospitals from the operation of this Act we do not believe that it is permissible for us to do so. The Congress of the United States did, in fact, see fit to do so and to, in effect, legislatively reverse *N.L.R.B.* v. *Cent. Disp.*

Both the Hospital and Amicus urge that the law applicable to public employees is also applicable to the private employees of St. Margaret Hospital. Primary reliance is placed on *Anderson Federation of Teachers* v. *City of Anderson,* 252 Ind. 558, 251 N. E. 2d 15, 254 N. E. 2d 329 (1970), where on rehearing our Supreme Court said the Anti-Injunction Statute "by its very nature and definitions is confined to 'labor disputes' in the private sector of the body politic." (254 N. E. 2d at p. 331). Reliance by the Amicus on Board of Commissioners of Green County v. Usrey, et al., 221 Ind. 197, 46 N. E. 2d 823 (1943), is in no sense authority to transpose the private employees of St. Margaret Hospital into the public employees of the *Anderson Teachers* case. Neither will

the tax exempt status transpose a private hospital into a public one. See *Mauer* v. *The Highland Park Hospital Foundation,* 90 Ill. App. 2d 409, 232 N. E. 2d 776 (1967). Nor will the receipt of public funds cause such transition. *Shulman* v. *Washington Hospital Center,* 222 F. Supp. 59 (D.C. 1963).

The parties are also here concerned with the right of these non-medical employees to organize, strike and picket and any duty by the hospital to bargain with their representatives.

The common law background of the 1933, Anti-Injunction statute is both pertinent and interesting. In 1893, the General Assembly enacted Acts 1893, ch. 76, which is now found in Burns' Indiana Statutes Annotated § 10-4906 to "protect employees and guarantee their rights to belong to labor organizations." In 1905, our Supreme Court decided *Karges Furniture Co.* v. *Amalgamated Woodworkers,* 165 Ind. 421, 428, 75 N. E. 877 (1905) in which Judge Hadley, speaking for the court, stated:

"Whatever one man may do all men may do, and what all may do singly they may do in concert, if the sole purpose of the combination is to advance the proper interests of the members, and it is conducted in a lawful manner."

Hence, in 1905, our Supreme Court made its first pronouncement of substantive labor law regarding the right to make a strike effective by means such as picketing. *Karges* represents the Indiana common law today.

In *Roth* v. *Local Union No. 1460 of Retail Clerks' Union,* 216 Ind. 363, 367, 24 N. E. 2d 280 (1939), our Supreme Court stated:

"Prior to the enactment of any statute upon the subject in this state, this court recognized, under the principles of the common law, the right to picket in controversies between an employer and his employees, where there was no resort to force, threats, intimidation, or other unlawful means. Karges Furniture Co. v. Amalgamated, etc., Union (1905), 165 Ind. 421, 75 N. E. 877, 2 L.R.A. (N.S.), 788, 6 Ann. Cas. 829. This right, when lawfully used, has been declared to be a proper exercise of free speech and peaceable assem-

blage and the right to use the public streets and highways. It has also been held that when such picketing is accompanied by force, intimidation, or coercion it becomes unlawful and will be enjoined by the court in the exercise of its equitable powers. Thomas v. City of Indianapolis (1924), 195 Ind. 440, 145 N. E. 550, 35 A.L.R. 1194. Picketing becomes unlawful when either the object thereof or the means used is unlawful. Thus picketing for an unlawful purpose will taint and render unlawful acts done in furtherance thereof which would have been lawful if done for a legitimate purpose; and, conversely, a lawful objection will not justify the employment of means which are themselves unlawful. Local 26, Natl. Bro. of Op. Potters v. City of Kokomo (1937), 211 Ind. 72, 83, 5 N. E. (2d) 624; McKay v. Retail Automobile Salesman's Local Union No. 1067 (1939), 89 P. (2d) 426, 90 P. 2d 113.

In 1933 The General Assembly passed what is commonly known as our Anti-Injunction Act. Acts 1933, ch. 12, §§ 40-501 to 40-514 Burns' 1933. The broad purposes of the act, as gathered from its terms, appear to be to declare the public policy of this state with respect to controversies between employers and their employees and to place limitations upon the jurisdiction of courts to grant injunctions in such cases. * * *

We can not, however, ignore the declarations of public policy contained in the above-mentioned act. These are directly expressed in specific terms. They are as follows:

'In the interpretation of this act and in determining the jurisdiction and authority of the courts of the state, . . . the public policy . . . is hereby declared as follows:

'. . . the individual unorganized worker . . . should be free to decline to associate with his fellows, . . . have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . .' Acts 1933, Ch. 12, § 2, § 40-502 Burns' 1933.

To ascertain the intent of the legislative body that enacted a statute is the fundamental rule for its judicial construction. When the purpose of an act is expressed in clear and unambiguous terms, this must be accepted as the solemn declaration of the sovereign. The public policy of the state

is a matter for the determination of the Legislature and not for the courts. The statute here under consideration declares that it is the public policy of this state that the individual unorganized worker shall be free to decline to associate with his fellows and that he shall be free from interference, restraint, or coercion on the part of his employer. This must mean that no labor union may demand that an employer require his employee to join such union, because no employer has the right to require an employee to join or refrain from joining a labor union. Any person or group which undertakes to coerce an employer to do that which is contrary to the express public policy of this state thereby undertakes to compel the performance of an unlawful act. The lawful weapon of peaceful picketing may not be utilized to accomplish such an unlawful purpose. It is quite immaterial that the things done to bring about the unlawful purpose were not per se unlawful. This is our interpretation of our statute."

It is clear that Indiana's Anti-Injunction Act does not deal with the question of the bargaining rights between this employer and employees. In this regard the statement of Judge Learned Hand in *Fay* v. *Douds*, 172 F. 2d 720, 724 (2d Cir. 1949) is relevant. Judge Hand stated:

"The Privilege of becoming an 'exclusive bargaining agent' is altogether distinct from the common law right of workmen to combine; it is a creature of Congress to whose grant Congress was free to attach such conditions as it saw fit."

In this regard the Indiana Legislature has not seen fit to act by enacting a comprehensive Labor Relations Act although some authorities have suggested such action is in order. See 42 Ind. Law Journal 77 (1966). The basic purpose of the Indiana Anti-Injunction Statute was to promote free employee choice by limiting the role of courts in labor disputes. The basic and important purposes of the statute are:

1. A statement of the public policy of Indiana to permit free choice by employees with respect to union activity.
2. To make illegal the enforcement of the so-called "yellow dog contract" whereby an employee agreed not to join a union.

3. To forbid the issuance of ex parte injunction in labor disputes.

4. To establish rigid substantive and procedural requirements which had to be met before an injunction could be issued in a labor dispute.

In effectuating this legislative policy our Supreme Court and this court have held that attempts to compel an employer to require his employees to join or refrain from joining a union are unlawful and enjoinable. See *Roth* v. *Local 1460*, 216 Ind. 363, supra. Even with picketing is for a lawful purpose our Anti-Injunction Statute permits the grant of an injunction to prevent violence and other illegal conduct. Our Supreme Court has also held that an injunction may be granted when picketing involves false or misleading statements. See *Weist* v. *Dirks, supra.*

Since it is legally permissible for employees, including nonmedical employees of a charitable hospital, to join a union peaceful picketing for the purpose of persuading them to join unions is likewise permissible. However, picketing which involves violence, intimidation or threats of the same is not permissible and may be enjoined. The point at which such picketing may involve constitutionally protected free speech was defined by our Supreme Court in *Davis* v. *Yates*, 218 Ind. 364, 32 N. E. 2d 86 (1941). See also, *Glover* v. *Parson*, 103 Ind. App. 561, 9 N. E. 2d 109 (1937) ; *Muncie Bldg. Trades Council* v. *Umbarger*, 215 Ind. 13, 17 N. E. 2d 828 (1938) ; and *Teamsters* v. *Stewarts' Bakery of Rochester*, 125 Ind. App. 174, 123 N. E. 2d 468 (1955).

The demarkation of peaceful picketing and constitutionally protected free speech on the one hand and violence and intimidation on the other hand was artfully set forth by Mr. Justice Frankfurter in *Driver's Union* v. *Meadowmoor Co.*, 312 U. S. 287, 292 (1941), cited with approval in *Davis* v. *Yates, supra*, where he stated :

"The question which thus emerges is whether a state can choose to authorize its courts to enjoin acts of picketing in

themselves peaceful when they are enmeshed with contemporaneously violent conduct which is concedely outlawed. The Constitution is invoked to deny Illinois the power to authorize its courts to prevent the continuance and recurrence of flagrant violence, found after an extended litigation to have occurred under specific circumstances, by the terms of a decree familiar in such cases. Such a decree, arising out of a particular controversy and adjusted to it, raises totally different constitutional problems from those that would be presented by an abstract statute with an overhanging and undefined threat to free utterance. To assimilate the two is to deny to the states their historic freedom to deal with controversies through the concreteness of individual litigation rather than through the abstractions of a general law.

* * *

In this case the master found 'intimidation of the customers of the plaintiff's vendors by the commission of the acts of violence,' and the supreme court justified its decision because picketing, 'in connection with or following a series of assaults or destruction of property, could not help but have the effect of intimidating the persons in front of whose premises such picketing occurred and of causing them to believe that non-compliance would possibly be followed by acts of an unlawful character.' It is not for us to make an independent valuation of the testimony before the master. We have not only his findings but his findings authenticated by the State of Illinois speaking through the supreme court. We can reject such a determination only if we can say that it is so without warrant as to be a palpable evasion of the constitutional guarantee here invoked. The place to resolve conflicts in the testimony and in its interpretation was in the Illinois courts and not here. To substitute our judgment for that of the state court is to transcend the limits of our authority. And to do so in the name of the Fourteenth Amendment in a matter peculiarly touching the local policy of a state regarding violence tends to discredit the great immunities of the Bill of Rights. No one will doubt that Illinois can protect its storekeepers from being coerced by fear of window-smashing or burnings or bombings. And acts which in isolation are peaceful may be part of a coercive thrust when entangled with acts of violence. The picketing in this case was set in a background of violence. In such a setting it could justifiably be concluded that the momentum of fear generated by past violence would survive even though future· picketing might be

wholly peaceful. So the supreme court of Illinois found. We cannot say that such a finding so contradicted experience as to warrant our rejection. Nor can we say that it was written into the Fourteenth Amendment that a state through its courts cannot base protection against future coercion on an inference of the continuing threat of past misconduct. Cf. Ethyl Gasoline Corp. v. United States, 309 U. S. 436.

These acts of violence are neither episodic nor isolated. Judges need not be so innocent of the actualities of such an industrial conflict as this record discloses as to find in the Constitution a denial of the right of Illinois to conclude that the use of force on such a scale was not the conduct of a few irresponsible outsiders. The Fourteenth Amendment still leaves the state ample discretion in dealing with manifestations of force in the settlement of industrial conflicts. And in exercising its power a state is not to be treated as though the technicalities of the laws of agency were written into the Constitution. Certainly a state is not confined by the Constitution to narrower limits in fashioning remedies for dealing with industrial disputes than the scope of discretion open to the National Labor Relations Board. It is true of a union as of an employer that it may be responsible for acts which it has not expressly authorized or which might not be attributable to it on strict application of the rules of respondeat superior. International Association of Machinists v. Labor Board, 311 U. S. 72, 80; Heinz Co. v. Labor Board, 311 U. S. 514. To deny to a state the right to a judgment which the National Labor Relations Board has been allowed to make in cognate situations, would indeed be distorting the Fourteenth Amendment with restrictions upon state power which it is not our business to impose. A state may withdraw the injunction from labor controversies but no less certainly the Fourteenth Amendment does not make unconstitutional the use of the injunction as a means of restricting violence. We find nothing in the Fourteenth Amendment that prevents a state if it so chooses from placing confidence in a chancellor's decree and compels it to rely exclusively on a policeman's club."

The above is in accord with the comment by Mr. Justice Brandeis in *Senn* v. *Tile Layers Union,* 301 U. S. 468, 478 (1937) that "Members of a union might, without special statutory authorization by a State, make known the facts of a labor dispute, for freedom of speech is guaranteed by the

Federal Constitution." For cases following and extending this view see *Thornhill* v. *Alabama,* 310 U. S. 88 (1940), *Carlson* v. *California,* 310 U. S. 106 (1940), *Giboney* v. *Empire Storage & Ice Co.,* 336 U. S. 490 (1949) and *Amalgamated Food Employees Union Local 590* v. *Logan Valley Plaza, Inc.,* 391 U. S. 308 (1968).

It is very apparent that the non-medical employees of the hospital had a right to join a labor union, to strike and engage in peaceful picketing absent violence, intimidation or fraud. It is equally clear that the hospital was under no legal duty to recognize said union as a bargaining agent or to engage in collective bargaining with said union. Thus any injunction in regard to such picketing must be based on evidence of violence, fraud or intimidation.

We are unable to find anything in the statutes, the court decisions or the expressed public policy of this state to exempt charitable hospitals from strikes by its non-medical employees. In this we believe this case is different from *Anderson Fed. of Teachers* v. *Anderson,* 252 Ind. 558, 251 N. E. 2d 16 (1969) where our Supreme Court did find such expressions of public policy. "The public policy of the state is a matter for the determination of the Legislature and not the courts." See *Roth* v. *Local Union No. 1460, supra,* 216 Ind. 363, 370. Therefore, in this case we should and will exercise judicial restraint and not engage in the making of public policy.

Therefore, we must reverse and remand with instructions to grant the parties a new trial. Reversed and remanded.

Hoffman, C.J., White, Staton, Robertson, Buchanan, and Lowdermilk, JJ., concur; Sullivan, P.J., concurs in result only.

NOTE.—Reported in 267 N. E. 2d 558.