THERESA A. HELVEY, ET UX. *v.* LYNN O'NEILL.

[No. 871A155. Filed November 8, 1972.]

636

*Robert S. Justice,* of Logansport, for appellants.

*Lynn O'Neill, Leland L. Smith,* of Logansport, *Albert W. Ewbank,* of Indianapolis, for appellee.

BUCHANAN, P.J.—*CASE SUMMARY*—This is an appeal from a court trial granting relief to plaintiff-appellee, Lynn

O'Neill (O'Neill), on his Complaint for Partition of a tract of real estate, and from a judgment denying a counterclaim of defendants-appellants, Theresa and John Helvey (Helvey), for tortious interference with contractual relations. We affirm. *FACTS*—Lucille Mahoney (Mahoney) was the owner of a farm located in Cass County, Indiana, which is the subject of this appeal.

On November 4, 1969 Mahoney died intestate leaving as her sole heirs at law two nieces, Helvey, a resident of Logansport, Indiana, and her sister, Barbara Fleming (Fleming), a resident of California. Helvey was appointed administratrix of Mahoney's estate, which was administered in Cass County.

On November 18, 1969, Fleming, hoping to sell her interest, sent a letter to Helvey regarding her interest in the real estate owned by Mahoney, saying in part:

> "* * * As to the real estate, I do not want it sold in the estate. If you are interested in buying it, as I understand you are, please send me an offer to purchase my interest (one-half). *I will not consider any offers* from any other possible purchaser *until we have explored the possibilities of an agreement between ourselves.* * * *" (Emphasis supplied.)

On December 13, 1969, Helvey, through her attorney, responded to Fleming's letter by making this offer:

> "Your sister, Theresa [Helvey], came to my office this morning and said that she had considered the purchase of your interest in Lucille's farm and decided that she was willing to pay for your half interest in the farm at the rate of $450.00 per acre. According to my calculations that would be $36,000.00 for your interest in the land. She believes that amount could be paid June 1, 1970. *Please give this offer consideration and reply.* * * *" (Emphasis supplied.)

In response to Helvey's offer, O'Neill, by letter, wrote:

> "* * * Theresa's [Helvey's] offer of $450.00 per acre for Barbara's share of the farm presents a problem. This offer may well be as much or more than the property is worth but we have no knowledge of values of real estate in Indiana.

Independant [sic] appraisals should be considered even those for tax purposes. Of course selling price and tax appraisal are rarely the same figure. *We want her to have the property at a fair price without consulting other buyers if possible. \* \* \*"* (Emphasis supplied.)

On January 18, 1970, after an appraisal of the real estate was filed in the estate in the amount of $62,000.00, Fleming sent a letter to Helvey's attorney which again refers to Helvey's offer:

"\* \* \* Theresa's [Helvey's] offer for purchase is a little higher than appraised price (about $25.00 per acre) and the same as Lucille recently got for unimproved land. *Without a more realistic offer from her, we're going to have to consider:*

\* \* \*

(c) *what offer can be had from other buyers. \* \* \*"* (Emphasis supplied.)

On January 26, 1970, Helvey responded, again through her attorney but did not tender "a more realistic offer." Instead, her attorney's letter explained, among other things, that at Mahoney's death title descended to Fleming and Helvey as tenants in common and added:

"Since she [Helvey] has made an offer you apparently do not wish to accept, I think it would be appropriate for you to make an offer to sell naming a definite price."

Fleming made no response to this letter nor to a follow-up letter by Helvey's attorney on March 27, 1970 seeking a decision from Fleming whether she would sell her interest to Helvey "and, if so, at what price."

By telephone on March 1, 1970 and by letter on March 4, 1970, O'Neill, a practicing attorney in Logansport, communicated with Fleming seeking to purchase Fleming's interest in the real estate. Fleming told O'Neill that she had offered to sell her interest to Helvey but that she had rejected her sister's offer of $450.00 per acre. O'Neill then offered Fleming

$37,000.00 for her interest, which represented an increase of $1,000.00 above Helvey's offer. There was evidence that O'Neill was aware of the communications between Fleming and Helvey and that he advised Fleming there was no binding agreement between the sisters and, further, that he would act as their attorney in the estate without cost to Fleming and that by selling to him a real estate commission would be avoided.

Then, on April 18, 1970, without informing Helvey or her lawyer, Fleming signed a warranty deed conveying her one-half interest in the real estate to O'Neill for $37,000.00. On the same day Fleming also signed a Petition for Issuance of Letters of Co-Administration requesting that O'Neill be appointed as co-personal representative of Mahoney's estate.

On April 27, 1970, O'Neill instituted this section for partition of the real estate. Helvey counterclaimed alleging that O'Neill had tortiously interfered with the contractual relations of Fleming and Helvey. The trial court denied Helvey's counterclaim finding that O'Neill was the owner of an undivided one-half interest in the real estate and was, therefore, entitled to relief by way of partition. The court further ordered that since Mahoney's estate had not yet been settled, any proceeds from the partition sale would be subject to the payment of any unsettled claims against Mahoney's estate and that distribution thereof must await final determination of claims, taxes, and expenses of Mahoney's estate.

These are the facts most favorable to O'Neill (appellee) and which support the judgment.

### ISSUES

*ISSUE ONE.*     Did the sale by Fleming to O'Neill, prior to final settlement of Mahoney's estate, pass title to O'Neill so as to permit him to bring an action for partition as a tenant in common?

*ISSUE TWO.*     Was O'Neill's suit for partition, brought before final settlement of Mahoney's estate, premature?

*ISSUE THREE.*  Did O'Neill's actions in purchasing Fleming's farm interest constitute a tortious inducement of breach of an existing contract between Fleming and Helvey?

As to *ISSUE ONE,* Helvey contends that upon the death of an intestate, possession and title to any real estate property descends to the personal representative and not to the intestate's heirs at law and therefore O'Neill as purchaser of Fleming's interest prior to closing the estate had no standing to bring an action for partition.

O'Neill states that under Indiana laws of intestate succession, title to real estate descends to the heirs at law immediately following the death of the intestate and not to the personal representative. Moreover, an heir to whom title descends has a right to sell his interest in that real property prior to a final settlement of the estate and that in addition to title only the right to possession of real estate is required to bring a partition action.

As to *ISSUE TWO,* Helvey argues that to permit a partition action to be brought before final settlement of an estate would disrupt the orderly administration of estates.

O'Neill argues that Helvey has waived this argument for failure to cite any authority pursuant to Rule AP. 8.3(A)(7).

As to *ISSUE THREE,* Helvey's position is that by the terms of Fleming's letter of November 18, 1970 an executory contract in the nature of a family settlement came into being between the sisters Helvey and Fleming. Thus O'Neill's purchase of Fleming's one-half interest in the real estate amounted to a tortious interference with the executory contract existing between Fleming and Helvey.

O'Neill in reply points to Fleming's letter of November 18, 1969, which only promised not to seek other offers until Flem-

ing and Helvey had the opportunity to explore the possibilities of a sale between them. Further, there never existed mutuality of obligation, consideration, or acceptance of a definite offer, and no contract ever came into existence.

## DECISION

*ISSUE ONE*—It is our opinion that the sale by Fleming to O'Neill, prior to final settlement of Mahoney's estate, did pass title and the right to possession of the real estate to O'Neill so as to permit him to bring an action for partition as a tenant in common.

IC 1971, 32-4-5-2, Ind. Ann. Stat. § 3-2401 (Burns 1968) is the source of authority as to who may compel partition of realty:

> "3-2401 [1260]. WHO MAY COMPEL.—*Any person holding lands as* joint tenant or *tenant-in-common,* whether in his own right or as executor or trustee, *may compel partition* thereof in the manner provided in this act. An administrator or executor may also compel partition as a tenant-in-common or joint tenant may do, whenever, in the discharge of his duties as such, it shall be necessary for him to sell the estate of the decedent therein. Trustees, administrators and executors may also be made defendants in actions for the partition of real estate to answer as to any interest they may have in the same." (Emphasis supplied.)

Without reference to possession, this statute specifies that *any person* who holds land as a tenant in common may seek a partition. Both the cases decided prior and subsequent to the adoption of § 3-2401 have generally held that in order to maintain an action for partition, either legal or equitable title and the "right" to possession must be in the party maintaining the action. *McClure* v. *Raber* (1939), 106 Ind. App. 359, 19 N. E. 2d 891; *Schori* v. *Stephens* (1878), 62 Ind. 441; *Godfrey* v. *Godfrey* (1861), 17 Ind. 6; *Weaver* v. *Gray* (1906), 37 Ind. App. 35, 76 N. E. 795; *Brunner* v. *Terman* (1971), 150 Ind. App. 139, 275 N. E. 2d 553. But the person seeking partition need not be in *actual* possession of the

land so long as he has title and the "right" to possession. *God-frey* v. *Godfrey, supra; Shetterly* v. *Axt* (1906), 37 Ind. App. 687, 76 N. E. 901; *Smith* v. *Andrew* (1912), 50 Ind. App. 602, 98 N. E. 734; *Coquillard* v. *Coquillard* (1916), 62 Ind. App. 489, 113 N. E. 481. While O'Neill's right to possession is not immediate during pendency of estate proceedings, and may be extinguished by exercise of the personal representative's right to sell real estate for certain purposes (Ind. Ann. Stat. § 7-903 (Burns 1953)), there is sufficient vitality in this right to support a partition action as we interpret § 3-2401, *supra,* and the decided cases.

Helvey would abolish the distinction in the Probate Code between real and personal property because it perpetuates a fiction of title from feudal times and exalts technicality above equity; and further elaborates on the substantial powers granted a personal representative with respect to real estate, maintaining the lodging of such powers in the personal representative amounts to vesting of legal title. Specifically, Helvey enumerates the powers of the personal representative with respect to real estate—may sell and convey good title under certain circumstances [IC 1971, 29-1-13-1, Ind. Ann. Stat. § 7-701 (Burns 1953)]; shall take immediate possession [§ 7-701, *supra*], duty to pay taxes [§ 7-701, *supra*]; may enforce actions for trespass [IC 1971, 29-1-13-3, Ind. Ann. Stat. § 7-703 (Burns 1953)]; may collect rents and profits [§ 7-701, *supra*]; may sue to recover possession [§ 7-703, *supra*]; may determine title under certain circumstances [IC 1971, 29-1-13-10, Ind. Ann. Stat. § 7-710 (Burns 1953)]; and may mortgage or lease the real estate [IC 1971, 29-1-15-2, Ind. Ann. Stat. § 7-902 (Burns 1953)].

Despite the broad range of powers given the personal representative, the Probate Code stops short in any of its provisions of vesting title in a personal representative rather than the heirs at law. It did not change prior law on this subject. See: *Coats* v. *Veedersburg State Bank* (1942), 219 Ind. 675, 38 N. E. 2d 243; *Reed* v. *Brown* (1939),

215 Ind. 417, 19 N. E. 2d 1015; *State ex rel. Dept. of Financial Institutions* v. *Kaufman* (1941), 218 Ind. 74, 30 N. E. 2d 978; *Hankins* v. *Kimball* (1877), 57 Ind. 42.

This is borne out by the Probate Code Commission Comments which indicate that the decisions prior to 1953 concerning the descent of title to real property would remain unchanged:

> "In substance this section provides that the personal representative shall take possession of both real and personal property except the homestead and is charged with the duty of collecting rents, paying taxes, keeping in repair and keeping the premises insured. He may also bring an action for possession or to determine the title to the same. *He takes title to the personal property but not to the real estate, the same as under the present law.*" (Emphasis supplied.)

The cases subsequent to the adoption of the Probate Code are in agreement with the Commission Comments. In *Demma* v. *Forbes Lumber Co.* (1961), 133 Ind. App. 204, 178 N. E. 2d 455, the court interpreted § 7-701, *supra* :[1]

> "We find under the new Probate Code, § 7-701, Burns' 1953 Replacement, the personal representative takes only possession of the real property and not title. * * *
>
> "Under § 7-123, Burns', *supra,* and, also the decisions of our Supreme Court, it is the general rule that title to a decedent's real estate vested immediately and absolutely in his heirs; the administrator had no power whatever over it; under the present law he takes possession of the real estate."

Thus, upon the death of Mahoney the Admniistratrix was entitled to possession of the realty during estate administra-

---

1. "7-701. POSSESSION OF ASSETS OF ESTATE.—Every personal representative shall have a right to, and shall take, possession of all the real and personal property of the decedent except the homestead of the surviving spouse and minor children. He shall pay the taxes and collect the rents and earnings thereon until the estate is settled or until delivered by order of the court to the distributees. He shall keep in tenantable repair the buildings and fixtures under his control and may protect the same by insurance. He may maintain an action for the possession of the real property or to determine the title to the same."

tion, and title vested in Fleming subject to divestment should it be needed for the payment of claims, taxes, expenses of administration, etc., pursuant to IC 1971, 29-1-15-3, Ind. Ann. Stat. § 7-903 (Burns 1953). *Demma* v. *Forbes Lumber Co.*, *supra; Hutter* v. *Weiss, supra; State ex rel. Dept. of Financial Institutions* v. *Kaufman, supra; Reed* v. *Brown, supra.*

Subject to this impediment, Fleming's interest could be sold prior to final settlement of Mahoney's estate. *Weakley* v. *Conradt* (1877), 56 Ind. 430; *Globe Mercantile* v. *Perkeytile* (1919), 189 Ind. 31, 125 N. E. 29; *Moore* v. *Moore* (1900), 155 Ind. 261, 57 N. E. 242; 1 *Henry's Probate Law & Practice* 715, (6th ed. 1954). The possibility that the real estate could be used to pay the unsettled debts of the estate does not affect the right of a vendee to maintain an action for partition. The partition proceeds are burdened with the payment of unliquidated debts. *Hancock* v. *Maynard* (1919), 72 Ind. App. 661, 126 N. E. 451.

*ISSUE TWO*—It is our opinion that O'Neill's suit for partition, brought before final settlement of Mahoney's estate, was not premature.

Helvey's assertion that O'Neill's suit for partition was premature because Mahoney's estate had not been finally settled and therefore the real estate might be needed to meet debts, is unencumbered by supporting authority.

Based on the reasoning and citation of authority in reaching our conclusion under *ISSUE ONE*, it should be evident that O'Neill, as a tenant in common, had standing prior to settlement of Mahoney's estate to bring an action for partition subject to the limitation that the real estate might be sold in order to pay claims, taxes, expenses of administration, and other proper charges.

The partition action prior to final settlement was not premature inasmuch as proceeds of the sale were made subject to the needs of the estate for these purposes. It is not neces-

sary to decide whether partition might be premature under other circumstances.

*ISSUE THREE*—It is our opinion that O'Neill's actions in purchasing Fleming's one-half interest in the real estate did not amount to a tortious interference with an existing contract between Fleming and Helvey.

There is such a tort as inducing breach of contract. In *Tenta* v. *Guraly* (1966), 140 Ind. App. 160, 221 N. E. 2d 577, the court reviewed the elements necessary to sustain an action for inducing breach of contract:

"The tort of inducing the breach of a contract has two elements which must be alleged and proven. They are, first, that defendants knew of the existence of the contract, and second, that the breach was intentionally induced."

Liability for interference with contractual relationships results only if there was an intentional interference without justification or cause with an intention to do wrongful harm or injury. *Fort Wayne Cleaners & Dyers Ass'n* v. *Price* (1956), 127 Ind. App. 13, 137 N. E. 2d 738.

However, the action for inducing another to breach a contract presupposes the existence of a valid and enforceable contract. *Grimm* v. *Baumgart* (1951), 121 Ind. App. 626, 96 N. E. 2d 915.

Throughout Helvey's brief it is assumed that a contract came into existence between the parties. So our quest is to determine whether the negotiations between the two sisters ever ripened in fact into an executory contract. A careful analysis of the correspondence leads us to characterize the communications between them in this manner:

*Fleming's letter of November 18, 1969*
An invitation for an offer from Helvey.

*Helvey's letter of December 13, 1969*
An offer by Helvey to purchase the real estate for $450.00 per acre.

*Fleming's undated letter referring to Helvey's letter of December 13, 1969*

Helvey's offer of $450.00 per acre under consideration.

*Fleming's letter of January 18, 1970*
Helvey's offer rejected and notice given that offers would be sought from other buyers.

*Helvey's letter of January 26, 1970*
Invitation by Helvey to Fleming to make an offer; rejection of Helvey's previous offer recognized.

*Helvey's letter of March 27, 1970*
Further inquiry seeking an offer from Fleming.

Fleming remained silent. Result . . . no contract ever came into existence. One offer was made and rejected and several invitations were extended to make an offer, all of which amounts to an unsuccessful series of negotiations leaving Fleming free to accept O'Neill's higher offer culminating in conveyance of Fleming's one-half interest on April 18, 1970. The negotiations between the parties never bore fruit.

This analysis is founded on familiar concepts of contract law. Helvey submits no reason or authority why this transaction should be immune from the law of offer and acceptance other than to refer to the well established principle that the courts will go far to uphold a family settlement. Even a settlement must be a "settlement." Agreements of this kind must be made in conformity with the law. *Knepper* v. *Eggiman* (1912), 177 Ind. 56, 97 N. E. 161; 1 *Henry's Probate Law and Practices* 271, § 15 (Grimes 6th ed. 1954).

It might be added that a mere request for an offer is not an offer and that an agreement to make an agreement is enforceable only if all the conditions of the contemplated agreement are specified. *National Tea Co.* v. *Weiss* (7th Cir. 1965), 341 F. 2d 331; *Avery* v. *Citizens Loan & Trust Co.* (1932), 94 Ind. App. 161, 180 N. E. 23.

As we see it, Fleming did "explore the possibilities" of selling her half interest to Helvey, but once Fleming put

Helvey on notice that "without a more realistic offer from her [Helvey], we're going to have to consider: * * * (c) what offer can be had from other buyers" (letter of January 18, 1970), Helvey had no right to interpret Fleming's silence as a continuation of negotiations. Furthermore, we are unaware of any legal duty requiring Fleming to respond to her sister's invitation that Fleming make an offer.

Obviously, Fleming was dissatisfied with her sister's offer and remained silent after her letter to Helvey dated January 18, 1970 failed to produce "a more realistic offer." While Fleming's silence from January 18, 1970 to April 18, 1970 was golden, Helvey was the pursuer of her sister's half interest and she allowed negotiations to drag after her $450.00 offer was rejected.

Furthermore, considering the evidence most favorable in support of the judgment, as we must do, there is no justification for attributing bad faith or malice to O'Neill for inducing Fleming not to contract with her sister for the purchase of the real estate. The mere inducement of another to refrain from the formation of a contract, if done in good faith, without malice or the employment of improper means, constitutes no grounds for an action for interference with contractual relations. *Wabash R. R. Co.* v. *Young* (1904), 162 Ind. 102, 69 N. E. 1003; *Spier* v. *Home Ins. Co.* (7th Cir. 1968), 404 F. 2d 896.

The tort that may exist prior to the formation of a contract is interference with prospective advantage and the "improper means" contemplated are "violence or intimidation, defamation, injurious falsehood or other fraud, violation of the criminal law * * *." *Prosser, Law of Torts* 977 (3rd ed. 1964). No such situation is before us.

There being no evidence to support either an action for inducing breach of contract or an action for interference with prospective advantage—

The judgment is affirmed.

Sullivan and White, JJ., concur.

NOTE.—Reported in 288 N. E. 2d 553.