ALICE WEEST *v.* BOARD OF SCHOOL COMMISSIONERS OF THE CITY OF INDIANAPOLIS AND INDIANAPOLIS EDUCATION ASSOCIATION.

[No. 1-1173A201. Filed December 26, 1974. Rehearing denied January 28, 1975.]

*William F. Diehl, Fulmer, Byrum & Gagnon,* of Indianapolis, for appellant.

*Lawrence McTurnan, Fred S. White, Bredell, Martin & McTurnan,* of Indianapolis, for appellee Board of School Commissioners, *John P. Price, Jonathan L. Birge, J. Lynn Boese, Bingham Summers Welsh & Spilman,* of Indianapolis, for appellee Indianapolis Education Association.

LYBROOK, J.—Plaintiff-appellant Alice Weest (Weest), an employee of defendant-appellee Board of School Commissioners of the City of Indianapolis (Board), initiated this action contesting the legality of a provision in an employment contract agreement resulting from negotiations between Board and intervening defendant-appellee Indianapolis Education Association (IEA). From the granting of IEA's motion for summary judgment, Weest appeals.

Weest is a school teacher who has been continuously employed in the Indianapolis Public School Corporation for twenty-one years. Board is a duly elected governing body acting on behalf of the school corporation and possessing, *inter alia,* the power to employ and contract for the employment of school teachers.[1] IEA is a professional association incorporated under the laws of this State, its membership being comprised of school teachers employed by Board. At all times relevant herein, Weest was not a member of IEA.

In 1969, Board and IEA entered into an agreement providing for an election to determine whether the designated unit consisting of all licensed contractual employees of Board desired that IEA serve as their representative for the purpose of collective bargaining with respect to salaries and other conditions of employment. It was further agreed that should

---

1. See, IC 1971, 20-5-2-2, Ind. Ann. Stat. § 28-1710 (Burns 1970).

IEA obtain a majority of the ballots cast, it would serve as the exclusive bargaining agent for all employees in the designated unit until successfully challenged in accordance with certain specified procedures. Signatories to the election agreement included representatives of Board and IEA and the Director of the Bureau of Mediation and Conciliation of the Division of Labor of the State of Indiana.

The election was conducted on May 21, 1969, resulting in 2,432 votes for as compared with 127 votes against representation by IEA. Thereupon, the Commissioner of Labor certified IEA as the sole bargaining agent for all employees in the specified unit.

For each school year subsequent to the above election, IEA and Board negotiated an agreement defining certain terms and conditions of employment of teachers employed by Board. However, during negotiations for the agreement to govern the 1972-73 school year, certain differences arose and, for reasons not material to the issues herein, the matter came before the Marion Circuit Court. On November 8, 1972, that court issued certain recommendations to Board and IEA for the settlement of the dispute, one provision thereof being: "A sick leave bank to be established for teachers to be administered by the IEA. Each teacher shall contribute one day's sick leave to the bank." On the following day the teachers of Indianapolis voted to accept the court's recommendations 2,405 in favor to 57 against. Thereafter, Board and IEA entered into a contract agreement governing the 1972-73 school year, which provided in part:

"Section 1: Every teacher shall have ten (10) days sick leave during his first year in the system and seven (7) days sick leave each year thereafter. Every teacher shall have two (2) leave days for personal use each year. A teacher may accumulate a total of not more than one hundred twenty (120) days of unused sick and personal leave; which accumulated leave shall be used for sick leave purposes only.

"A sick leave bank shall be established for teachers to be administered by the IEA. Each teacher shall contribute one day's sick leave to the bank."[2]

On February 16, 1973, there was noted on the record of each teacher the deduction of one sick leave day to be contributed to the sick leave bank. Thereafter, Weest initiated this action for declaratory judgment in the form of a class action against Board requesting an adjudication as to whether she was bound by the contract agreement entered into between Board and IEA and requesting that Board be prohibited from deducting any of her sick leave days and that any days theretofore deducted be returned. IEA sought and was granted leave to intervene as an additional party defendant.

Following venue of the cause to the Hancock Superior Court, Weest moved for judgment on the pleadings, which was treated by the court as a motion for summary judgment. IEA requested a hearing to determine whether Weest's action was properly maintainable as a class action, moved to dismiss, and moved for summary judgment. Following hearing, the court determined that the action was properly a class action. Thereafter, hearing was had on the above remaining pending motions. Weest's motion for judgment on the pleadings and IEA's motion to dismiss were denied. The court then entered judgment in favor of Board and IEA and against Weest on IEA's motion for summary judgment, finding that there existed no genuine issue as to any material fact and that defendants were entitled to judgment as a matter of law.

## I.

The authority of school boards to operate their respective school corporations is derived from the Indiana General School

---

2. Within the temporary guidelines drafted by the IEA to govern the administration of the sick leave bank is found the following statement of purpose:

"The purpose of the sick-leave bank is to relieve teachers from undue financial burdens due to absence from work on a long-term basis due to illness, injury or incapacitation sufficiently severe that it would make their presence in school inadvisable."

Powers Act.[3] In regard to the authority to contract for the employment of teachers, the Act contains the following limitation:

> "The compensation, terms of employment and discharge of teachers shall, however, be subject to and governed by the laws relating to employment, contracting, compensation and discharge to teachers; . . . ."[4]
>
> " 'Laws relating to employment, contracting, compensation and discharge of teachers' shall refer to . . ., Acts of 1945, Ch. 231 [§§ 28-4507—28-4510], . . ., and any other laws relating to such employment, contracting, compensation and discharge."[5]

Among the laws relating to compensation of teachers is found the following provision:

> ". . . Each teacher shall be entitled to be absent from work on account of illness or quarantine for a total of ten [10] days the first year and seven [7] days in each succeeding year without loss of compensation, . . . If in any one school year the teacher shall be absent for such illness or quarantine less than the prescribed number of days, the remaining days shall be accumulative to a total of ninety [90] days."[6]

The agreement between Board and IEA grants to each teacher the prescribed minimum number of yearly sick leave days. However, the agreement further provides that each teacher shall contribute one of those days to the sick leave bank. Weest contends that this latter provision operates to deprive her of a sick leave day to which she has a statutory right.

We are inclined to agree with Weest's contention that the Board lacks authority to enter into any agreement which operates in derogation of the laws governing compensation of teachers. However, we cannot agree that a deprivation of

3. IC 1971, 20-5-1-1, Ind. Ann. Stat. § 28-1701, *et seq.* (Burns 1970).
4. IC 1971, 20-5-2-2, Ind. Ann. Stat. § 28-1710 (Burns 1970).
5. IC 1971, 20-5-1-3(h), Ind. Ann. Stat. § 28-1703(h) (Burns 1970).
6. IC 1971, 20-6-16-2, Ind. Ann. Stat. § 28-4508 (Burns 1970).

a statutory right has resulted in the case at bar. The temporary guidelines drafted to govern the administration of the sick leave bank provide:

"Any teacher who has exhausted all accumulated sick leave days, and who needs the one additional sick leave day contributed by the teacher to the sick leave bank, shall be guaranteed reimbursement by the IEA for that additional day even if all of the days in the Sick Leave Bank have heretofore been exhausted."

In light of this guarantee, Weest's argument is relegated to a matter of form as opposed to substance. That the contributed sick leave day has been deducted from the personal records of the teacher is immaterial if the day remains available to the teacher if needed. In our view, the implementation of the sick leave bank has operated to expand upon rather than contract the minimum sick leave benefits provided by law. Therefore, Board's agreement to the establishment of the sick leave bank was not contrary to the laws governing compensation of teachers, and the deduction of a sick leave day from Weest's personal records did not result in deprivation of a statutory right. Neither did the deduction constitute an assignment of wages contrary to any statutorily prescribed formalities.

## II.

The grant of authority under the Indiana School Powers Act[7] is of sufficient breadth to permit the governing body of a school corporation to enter into an agreement providing for collective bargaining with an organization acting in the capacity of a teachers union. *Gary Teachers Union, Local No. 4, American Federation of Teachers v. School City of Gary* (1972), 152 Ind. App. 591, 284 N.E.2d 108; *East Chicago Teachers Union, Local No. 511 v. Board of Trustees of School City of East Chicago* (1972), 153 Ind. App. 463, 287 N.E.2d 891. In each of these cases, this court cited with approval *Chicago Division of Illinois Education Associa-*

7. IC 1971, 20-5-1-1 *et seq.*, *supra.*

*tion* v. *Board of Education of City of Chicago* (1966), 76 Ill. App.2d 456, 222 N.E.2d 243, wherein it was determined that the school board did not require legislative authority to enter into a collective bargaining agreement with a sole collective bargaining agent selected by its teachers. Therein is found the following:

> "National Labor Relations Board v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937), where the Supreme Court upheld the validity of the National Labor Relations Act and pointed out that the Act was designed to 'protect' the right to organize and the right to organize included the right to organize for the purpose of collective bargaining, which right existed separate from the Act.
>
> "The CTU, in asserting that the right of employees to organize for collective bargaining is a right also enjoyed by public employees, states, 'employment by government does present the occasion for limitation of rights, but until government actually attempts to limit rights they remain unfettered,' Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952) ; United Public Workers of America (CIO) v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947), and 'while Taxpayer Broman seemingly assumes that by entering public service employees thereby cede all their rights and have only those which the government gives, the exact opposite is true. Thus public employees in Illinois maintain their right to organize for the purpose of collective bargaining, at least until that right is legitimately limited,' and 'the proper question then is whether the instant Board of Education is under some legal inhibition.' "

Accordingly, Weest does not challenge the authority of Board to engage in collective bargaining with IEA. However, she does contest the purported authority of IEA to act as the representative of all teachers employed by Board. Specifically, it is her position that since she did not consent, by membership, vote, or other means, to representation by IEA, that organization lacked authority to bargain on her behalf and, therefore, could not by agreement authorize the deduction by the Board of one of her sick leave days.

Initially we note that in her deposition, Weest conceded that she had never attempted to individually bargain the terms of her employment. Further, she does not contend that the Board refused to bargain with any person or organization acting on her behalf. Nevertheless, in our opinion the issue presented is of sufficient public concern to warrant discussion.

As the parties have aptly pointed out, public employees are excluded from coverage of the National Labor Relations Act.[8] Further, the Indiana Collective Bargaining Act for teachers,[9] which recognizes the concepts of selection and recognition of an exclusive bargaining representative by secret ballot election, was not yet effective at any time relevant herein. However, IEA submits that in *Gary Teachers Union, supra,* this court impliedly recognized and held that a school board has discretionary authority to grant exclusive recognition to a teachers union for purposes of collective bargaining. Examination of that case reveals that the question of exclusive representation was not specifically brought into issue. However, even in the absence of express case or statutory authority, we believe that the dictates of sound public policy require approval of the grant of exclusive recognition to IEA as bargaining agent of all teachers employed by Board.

In *Local 858 of the American Federation of Teachers* v. *School District No. 1 in the County of Denver* (D. Colo. 1970), 314 F.Supp. 1069, plaintiff unsuccessfully contested the constitutionality of the grant by the school district of certain exclusive privileges to one of two competing teachers unions after that union had won a representation election. In discussing the several interests served by the action of the school district, the court said:

"It eliminates inter-union competition for membership within the public schools except at time of representation elections. This has several salutary aspects. Orderly functioning of the schools as education institutions is insured

---

8. See, 29 U.S.C.A. § 152.

9. IC 1971, 20-7.5-1-1, *et seq.,* Ind. Ann. Stat. § 28-4551, *et seq.* (Burns Supp. 1974).

through the limiting of the time span when they may become a labor battlefield. The representative union is not subjected to competition within the schools, and thus is better able to function as a representative, its efforts not spent in constant competition with the union that lost the representation election. The fact that the represenative's strength is not bled away by such constant high intensity inter-union conflict allows the public employees better representation, providing a more beneficial exercise of the right of association. *Finally, all of these benefits resulting from the grant of exclusive privileges to the elected representative serve the principal policy of insuring labor peace in public schools. Labor peace means a continuity of ordered collective bargaining between school officials and representatives of the teachers. It means a lowered incidence of labor conflict and strife, thus insuring less interference with the functioning of the public schools as educational institutions."* (Emphasis added.)

Should the Board attempt to enter into bargaining with every individual teacher or his representative and the representatives of any number of teacher organizations, the probability of arriving at a uniform contract agreement would be, at the very least, severely diminished. We envision that such a cumbersome and protracted process would in all probability impede the ability of the Board to effectively and expeditiously discharge its other several duties. Further, the intensification of competition among various representative organizations, an inevitable by-product of such a process, would, in our opinion, interfere with the orderly functioning of the entire school system. We have little doubt that these and other similar policy considerations substantially contributed to the decision of our Legislature to incorporate the concept of exclusive representation into our new Collective Bargaining Act for Teachers.

Acceptance of Weest's contention that the majority elected teachers representative may only bargain on behalf of those teachers explicitly consenting to representation could lead to but one practical result, that being refusal by the Board to engage in any form of collective bargaining whatsoever. Under such circumstances, the teachers' right to organize

for the purpose of collective bargaining would lack any vehicle for effectuation. It would be an empty right at best.

That exclusive representation maximizes the effectiveness of collective bargaining cannot be doubted. In response to a challenge of a statute providing for exclusive recognition of a majority elected representative for purposes of collective bargaining by public employees, the Supreme Court of New Jersey in *Lullo* v. *International Association of Fire Fighters, Local 1066* (1970), 55 N.J. 409, 262 A.2d 681, wrote:

> "However, the major aim could not be accomplished if numerous individual employees wished to represent themselves or groups of employees chose different unions or organizations for the purpose. Such absence of solidarity and diffusion of collective strength would promote rivalries, would serve disparate rather than uniform overall objectives, and in many situations would frustrate the employees' community interests. See Chamberlain, Labor, 179 (1958). Obviously parity of bargaining power between employers and employees could not be reached in such a framework. So the democratic principle of majority control was introduced on the national scene, and the representative freely chosen by a majority of the employees in an appropriate unit to represent their collective interests in bargaining with the employer was given the exclusive right to do so. 29 U.S.C.A. § 159(a). Thus this policy was built on the premise that by pooling their economic strength and acting through a single representative freely chosen by the majority, the employees in such a unit achieve the most effective means of bargaining with an employer respecting conditions of employment. N.L.R.B. v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967); Medo Photo Supply Corp. v. N.L.R.B., 321 U.S. 678, 684, 64 S.Ct. 830, 88 L.Ed. 1007, 1011 (1944); J. I. Case Co. v. N.L.R.B., 321 U.S. 332, 338, 64 S.Ct. 576, 88 L.Ed. 762, 768 (1944). Experience in the private employment sector has established that investment of the bargaining representative of the majority with the exclusive right to represent all the employees in the unit is a sound and salutary prerequisite to effective bargaining. Beyond doubt such exclusivity—the majority rule concept—is now at the core of our national labor policy. N.L.R.B. v. Allis Chalmers Mfg. Co., *supra,* 388 U.S. at 180, 87 S.Ct. 2001.
>
> Application of the majority rule concept strengthens the right of the individual employee to obtain fair and equitable

terms of employment. It brings the collective strength of all the employees in the unit to the negotiating table and thus enhances the chances of effectuating their community purposes and serving the welfare of the group."

In light of all foregoing considerations, we are firmly convinced that the concept of exclusive representation best serves not only the public interest in the orderly operation of our schools but also the interests of the individual teachers in the system.

In further support of her contention that recognition of IEA as the bargaining agent of all teachers is contrary to law, Weest relies on the following provision found among our State labor laws:

"No worker or group of workers who have a legal residence in the state of Indiana shall be denied the right to select his or their bargaining representative in this state, or be denied the right to organize into a local union or association to exist within and pursuant to the laws of the state of Indiana: Provided, That this act shall in no way be deemed to amend or repeal any of the provisions of the National Labor Relations Act [U.S.C., tit. 29, §§ 151-166]. [Acts 1957, ch. 181, § 2, p. 386.]"[10]

We have found but one case purporting to interpret this provision. In *Peters* v. *Poor Sisters of Saint Francis* (1971), 148 Ind. App. 453, 267 N.E.2d 558, this court wrote:

"In regard to this statute Professor Getman states:

'At first reading this appears to be a significant statute. The right of employees to select a bargaining representative seems to imply that management is required to recognize and bargain with a properly chosen union. But careful reading of the statute indicates that it was not meant to impose a duty on employers to bargain collectively. The title and language of the statute suggest that its primary purpose was to permit the formation of local unions and that the legislature intended to prevent undue control by national unions over local members. This interpretation is supported by such unofficial legislative history as can be found, and by the absence of a remedy for violation of provision for

10. IC 1971, 22-7-1-2 (Burns Code Ed.).

determining questions of majority choice. Even the unnecessary reference to the NLRA suggests an attempt to regulate union internal organization rather than collective bargaining.' 42 Ind. Law Journal, p. 87."

It therefore appears that this provision fails to lend support to any contention being asserted by Weest in this appeal.

In conclusion, we hold that even in the absence of explicit statutory authority, Board had the power to enter into a collective bargaining agreement providing for exclusive representation of all teachers by their majority elected representative. Further, we hold that IEA, as the majority elected representative had authority to bargain on behalf of all teachers in the unit designated by the consent election agreement.

### III.

Finally, Weest submits that the establishment of the sick leave bank is inconsistent with Board's duty to conduct its affairs in a manner consistent with accountability. This contention, however, rests upon the mere assertion that the plan amounts to the turning over to IEA of approximately 200,000 dollars of public funds to do with as it pleases. We find the record devoid of any support whatsoever for this assertion.

### CONCLUSION

Weest having failed to demonstrate that the decision of the trial court granting the motion of IEA for summary judgment was contrary to law, the judgment of the Hancock Superior Court must be affirmed.

Robertson, P.J. and Lowdermilk, J., concur.

NOTE.—Reported at 320 N.E.2d 748.