**In the Matter of COUNTY DEPARTMENT OF PUBLIC WELFARE OF LAKE COUNTY, Defendant-Appellant,**

v.

**AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL–CIO, INDIANA COUNCIL 62, by Joseph Bolt, Council Director, and Lake County Department of Public Welfare Employees, Local of American Federation of State, County and Municipal Employees, AFL–CIO, by J. Edward Johnston, President, and J. Edward Johnston, Plaintiffs-Appellees.**

No. 3–578A114.

Court of Appeals of Indiana, Third District.

Feb. 5, 1981.

Thomas C. Ridgely, Gary, for defendant-appellant.

Charles S. Brown, Jr., and Nancy S. Brown, Brown & Brown, New Castle, for plaintiffs-appellees.

GARRARD, Judge.

This is an appeal from a judgment ordering the Lake County Welfare Board (the board) to engage in collective bargaining in good faith with the American Federation of State, County and Municipal Employees, AFL–CIO (the union) as the exclusive bargaining agent of its employees. We reverse.

On April 25, 1975, the governor approved the Public Employees Bargaining Act, IC 22–6–4–1 et seq. as enacted by the legislature. The act was to become effective July 1, 1975.

Presumably in anticipation of exercising rights afforded by the act, on May 7, 1975, a number of labor officials approached the board and indicated that they were seeking recognition as collective bargaining agent for the employees of the county welfare department. In order to resolve the matter, the board agreed to hold an election among department employees to determine their wishes.

On May 21st a "Consent Election Agreement" form provided by the Indiana Division of Labor was executed by representatives of the board and the union. Pursuant thereto the Division of Labor conducted an election on June 10th and on June 18, 1975, certified the union as the sole agent of the department's employees for purposes of collective bargaining.

The parties began negotiating in early August and continued to bargain until the latter part of January 1976. At that time the State Welfare Director and the Director of Labor Relations for the State Personnel Division requested the board to cease negotiations on the ground that under the State Personnel Act, IC 4–15–2–1 et seq., the employees involved were state employees rather than county employees.

On February 4, 1976 the Benton Circuit Court declared the Public Employees Bargaining Act unconstitutional. On appeal the Supreme Court affirmed. *I.E.E.R.B. v. Benton Community School Corp.* (1977), 266 Ind. 491, 365 N.E.2d 752.

When the board declined to negotiate further, the union instituted this action for mandate and specific performance. The trial court granted relief as heretofore set forth.

We first observe that when the statute was determined to be unconstitutional the effect was to leave the law as though the statute had never been enacted. Thus, validity of the contract cannot depend upon the statute's provisions. *Oolitic Stone Co. of Ind. v. Ridge* (1910), 174 Ind. 558, 91 N.E.

944; *Coleman v. Mitnick* (1964), 137 Ind. App. 125, 202 N.E.2d 577, *reh. den.* 137 Ind.App. 125, 203 N.E.2d 834.

The union argues, however, that the contract and judgment are sustainable upon principles of general contract law. It supports this contention by reference to three provisions contained in the agreement executed by the parties on May 21, 1975.

Paragraph 6 of the agreement stated that if the union won the election, the employer "will begin negotiations on a contract within 15 days."

Paragraph 7 provided that if over 50% of those voting in the election selected the union, the employer would recognize the union "as the exclusive Bargaining Agent, in compliance with existing State and Federal laws."

Finally, paragraph 14 stated, "Any questions not covered by the Agreement may be determined in accordance with Consent Election Procedure followed by the National Labor Relations Board."

In considering the proper effect of the agreement, it is critical at the outset that we distinguish the situation before us from two related sets of circumstances.

In *Gary Teachers Union v. School City of Gary* (1972), 152 Ind.App. 591, 284 N.E.2d 108 and *East Chicago Teachers Union v. Board of Trustees* (1972), 153 Ind.App. 463, 287 N.E.2d 891, this court was confronted with the issue of collective bargaining by school corporations in the absence of any applicable statute imposing a duty of collective bargaining. However, both cases involved the enforceability of collective bargaining contracts covering the wages, hours and working conditions of the employees involved which had been *actually agreed to* and accepted by the parties. Moreover, no question was presented as to the effect of the agreement upon employees who did not desire to have the union serve as their agent. The legal issue before the court was the power of the board to voluntarily enter such a contract. No such contract is involved in the present dispute.

Secondly, the form of the court's order requires bargaining to the ascertainable standard of "good faith," and through its mandate that the board "perform its contract," requires the board to recognize the union as the *exclusive* bargaining agent for all employees "in compliance with existing state and federal laws." Thus, the situation presents more than the limited issues of whether the employees have rights to freedom of association and free speech as guaranteed by the constitution. *See, e. g., N.A.A.C.P. v. Button* (1963), 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405. *See also Pickering v. Board of Education* (1968), 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (free speech); *Shelton v. Tucker* (1960), 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (right of association).

The common law of this state does not, of course, grant to one group of individuals the right to impose their will upon another group merely because the whole number work for the same employer and the former group constitute something more than 50% of the total. Indeed one of the principal purposes manifested by Section 9 of the Wagner Act, nationally, was to alter that consequence so labor might bargain on more equal terms with management. *See, e. g., Consolidated Edison Co. v. N.L.R.B.* (1938), 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126. Similarly, the notion that between employer and employee there should be not only the right but a *duty* to bargain over the terms of employment is a creature of statute.[1] *Peters v. Poor Sisters of Saint Francis Seraph* (1971), 148 Ind.App. 453, 267 N.E.2d 558. While such statutes do not command the parties to agree, they are enforceable through imposing the duty to bargain by an ascertainable standard, good faith, through the prohibition of unfair labor practices. *See* 29 U.S.C.A. § 158(a)(5); IC 22–6–4–5(a)(5).

When confronted with the question, the courts have held that there is no constitutional right or obligation to bargain collec-

---

1. Employees of the state and its political subdivisions are excluded from coverage under the National Labor Relations Act. 29 U.S.C.A. § 152(2).

tively. *Hanover Tp. Fed. of Teachers (AFL–CIO) v. Hanover Community School Corp.* (7th Cir. 1972), 457 F.2d 456; *Indianapolis Education Ass'n v. Lewallen* (7th Cir. 1969), 72 LRRM 2071.

Bypassing the question of whether the board is actually the employer, and assuming *arguendo* that the board could enter into an agreement applicable to those employees who wanted the union to speak for them, what is the effect of the election agreement of May 21, 1975 as an independent contract?

Under Indiana law, in order to be enforceable a contract must be sufficiently certain and definite in all its essentials that we can ascertain when and whether it has been performed.

█ Here the only requirement of paragraph 6 of the agreement was that the board was to "begin negotiations on a contract within 15 days" if the union was determined to be the bargaining agent. While it does not appear that negotiations were commenced within that time limit, nothing is made of that fact by the parties and it is undisputed that they did negotiate for several months prior to the institution of these proceedings. What is critical is that the agreement required no more. The language employed in the instrument was at most an agreement to make an agreement. As such, under Indiana law the promise was illusory and is unenforceable. *Helvey v. O'Neill* (1972), 153 Ind.App. 635, 288 N.E.2d 553; *Wallace v. Mertz* (1927), 86 Ind.App. 185, 156 N.E. 562.

Nor is this conclusion altered by the terms of paragraphs 7 and 14 of the agreement. Paragraph 7 called for recognition of the union as *exclusive* bargaining agent "in compliance with existing State and Federal laws." With the state statute declared unconstitutional, there simply were no state or federal laws which applied to permit the status referred to.

Paragraph 14 provided that "any questions not covered by the Agreement may be determined in accordance with Consent Election Procedure followed by the National Labor Relations Board."

The subject matter of the agreement, as well as that of the procedure referred to, deals with the conduct of an election to determine an exclusive bargaining agent. *See* National Labor Relations Board, Statement of Procedures, Rules and Regulations, Series 8, § 101.19. Such agreements are provided for in labor law as a means of avoiding the uncertainty, delay and expense involved in the formal determination of representation questions.[2] The one before us was executed nearly upon the eve of what all must have thought would be the effective date of such an authorizing statute in Indiana. However, such was not the case.

We agree the document might stand on its own corners. We do not believe, however, that the included reference to election procedure may be utilized to lever into the agreement the substantive obligations which do not otherwise exist apart from statute, and which would be necessary to dispel the illusory quality of the board's bare promise to "begin negotiations on a contract." Since this is so we need not consider the other allegations raised on appeal.

We reverse the judgment of the trial court and remand with instructions to enter judgment for the appellant.

Reversed and remanded.

HOFFMAN, P. J., concurs.

STATON, J., concurs in result and files separate opinion.

STATON, Judge, concurring.

I concur in the result reached by the majority. However, I am unable to agree with the rationale upon which the majority premises its conclusion. The majority's cursory (and perhaps inaccurate) contractual

---

**2.** Such determinations involve not only majority choice. A necessary prerequisite is the consideration and definition of the unit, the group which through sufficient commonality of interest is appropriate for a collective bargaining purpose.

analysis of the consent election agreement effectively eludes the fundamental issue presented in this case. I view that issue as being whether county-level welfare employees may impose a collective bargaining requirement upon an employment structure which is comprehensively regulated by an existing state merit system. (State Personnel Act, IC 1976, 4–15–2–1 *et seq.* (Burns Code Ed.)) The resolution of this issue[1] requires an analysis of the political realities in which the Lake County Welfare Department conducts its personnel management.

County-level welfare employees are "state service" employees whose terms of employment are controlled by the state merit system. IC 1976, 4–15–2–3(a)(1) (Burns Code Ed., 1980 Supp.); *see also, State v. King* (1980), Ind.App., 413 N.E.2d 1016. The statement of general purpose of the State Personnel Act reflects the extensive control the state is authorized to exercise over county-level welfare employees:

> "[The State Personnel Act] shall be liberally construed to effectuate its policies and purposes to increase governmental efficiency, to insure the appointment of qualified persons to the state service hereinafter defined solely on the basis of proved merit, to offer any person a fair and equal opportunity to enter such state service, and to afford the employees in such state service an opportunity for public service and individual advancement according to fair standards of accomplishment based upon merit principles, and to which ends there is by this chapter established a personnel system based on merit and scientific methods relating to the appointment, compensation, promotion, transfer, lay off, removal and discipline of employees and to other incidents of state employment."

IC 1976, 4–15–2–1 (Burns Code Ed., 1980 Supp.). The provisions of the State Personnel Act and the administrative regulations promulgated by the State Personnel Board (*see,* 30 IAC 1–1–1 *et seq.* (1979) prescribe in detail various substantive and procedural mechanisms for establishing and controlling the terms of employment for state service employees.

In effect, the state merit system places within the control of the State Personnel Board the terms of employment which have been considered historically as the essential areas of collective bargaining between labor and management. Many aspects of personnel management, such as compensation, hours, position classification, grievance resolution, and discipline and discharge procedures, are subject to state control under the state merit system. IC 4–15–2–5 *et seq.* County welfare departments are under a statutory duty to control personnel management in accordance with state regulations. This is not to say that county welfare departments function merely as conduits for the state in administering the employment terms of the state merit system. County welfare departments retain some managerial authority over terms of employment not regulated by the state. Also, county welfare departments exercise their discretion in controlling terms of employment for which the state has established minimum and maximum guidelines, such as compensation. Thus, it is evident that county welfare departments and the State Personnel Board (through the State Department of Public Welfare) function as an integrated enterprise in the control of the terms of employment for county-level welfare employees. Each of these governmental entities performs a specified role of personnel management. I view these interrelated governmental entities as "joint employers" of county-level welfare employees, as have other jurisdictions when confronted with the same personnel management issue. *See, American Federation of State, County and Municipal Employees, AFL–CIO v. County of Lancaster, Division of Public Welfare* (1976), 196 Neb. 89, 241 N.W.2d 523; *County of Ulster v. CSEA Unit of Ulster County Sheriff's Department* (1971), 37 App.Div.2d 437, 326 N.Y.S.2d 706; *Costigan v. Philadelphia Finance Department*

---

1. The Lake County Welfare Department properly preserved this issue for appellate review. The majority deemed it unnecessary to address the issue.

*Employees Local 696, American Federation of State, County and Municipal Employees, AFL–CIO* (1975), 462 Pa. 425, 341 A.2d 456.

I find the Supreme Court of Nebraska's resolution of the issue presented in *AFSCME, AFL–CIO v. County of Lancaster, supra,* particularly persuasive. The Court held that the Nebraska employee merit system inextricably tied the county and the state in the managerial control of county-level welfare employees so that both governmental entities were to be considered as joint employers for the purpose of negotiating a collective bargaining agreement.[2] The following excerpts from the Court's opinion reflect the rationale upon which the Court relied in requiring the state's presence at the bargaining table:

"It appears that under the state merit system, the state department is empowered to control most of the important facets of labor management relations. The state's involvement in the areas traditionally subject to collective bargaining is apparent. Since the state and the counties are treated as one unit for personnel management purposes by the stat-

ute and applicable regulations, it follows that the two must be considered a functionally integrated unit for the purpose of collective bargaining with the plaintiff.

\* \* \* \* \* \*

"Considering the statutorily required participation of the merit system council, it would seem that the state must be a party to any contract negotiated between county and the union. The experience of Douglas County, detailed in its brief as amicus curiae, points up the absurd result which would follow if the position of the Court of Industrial Relations were sustained. The county would have no control over and would be unable to bargain collectively on most of the issues traditionally considered to be at the heart of collective bargaining.

"The state practically controls grievance procedures under the state merit system. Salary matters under the state pay plan are effectively under its control. The employees of county public welfare are paid according to the state merit plan, with funds provided by the state.

**2.** Nebraska county-level welfare employees were authorized by statute to organize collectively for the purpose of engaging in collective bargaining. Nev.Rev.Stat. § 48–837. As the majority has stated in the present case, the Lake County Welfare Department and its employees had no statutory authority to engage in collective bargaining after the Public Employees Bargaining Act was declared unconstitutional. Nevertheless, the absence of a collective bargaining statute for public employees does not provide a sufficient basis for distinguishing the present case from *AFSCME, AFL–CIO v. County of Lancaster, supra.* Indiana courts have generally held that public employees may enter into collective bargaining agreements (and, by implication, consent election agreements) with their governmental employers even in the absence of specific statutory authority for collective bargaining. *East Chicago Teachers Union, Local 511 v. Board of Trustees of School City of East Chicago* (1972), 153 Ind.App. 463, 287 N.E.2d 891; *Gary Teachers Union, Local No. 4, American Federation of Teachers v. School City of Gary* (1972), 152 Ind.App. 591, 284 N.E.2d 108. Such collective bargaining agreements are permissive and require the consent of both parties to make them enforceable. The authority for public employees and their employers to enter into permissive collective bargaining agreements may be

inferred from general statutory authority empowering public agencies to perform acts which are necessary to carry out and accomplish the purpose for which they exist. *East Chicago Teachers Union, supra,* 153 Ind.App. at 465, 287 N.E.2d at 893. A public employer is not precluded from recognizing a properly elected bargaining agent as the exclusive representative of *all* public employees in the bargaining unit, including those who did not expressly consent to representation by the bargaining agent. *Weest v. Board of School Commissioners of the City of Indianapolis* (1974), 162 Ind.App. 614, 320 N.E.2d 748. In *Weest,* the court stated:

"In conclusion, we hold that *even in the absence of explicit statutory authority,* Board had the power to enter into a collective bargaining agreement providing for exclusive representation of all teachers by their majority elected representative. Further, we hold that IEA, as the majority elected representative had authority to bargain on behalf of *all* teachers in the unit designated by the consent election agreement." (Emphasis added.) 162 Ind.App. at 625, 320 N.E.2d at 755. This statement of Indiana law is not readily apparent from the majority opinion in the present case.

Section 68–708, R.R.S. 1943, mandates compliance with the state merit system on matters relevant to personnel policies. This includes holidays, sick leave, and other fringe benefits.

"To hold on this record that county is the sole employer of the employees concerned is to ignore reality. County actually has no effective control over the areas usually embraced in labor agreements. To force it into bargaining as the sole employer will be either a futile or a disastrous act.

"On the basis of the record, we determine that county is in no position to effectively bargain with any bargaining agent as the sole employer of county welfare employees. Collective bargaining is not possible without the inclusion of the State Department of Public Welfare, because the activities of the Lancaster County Board of Public Welfare are jointly controlled by and interrelated with the State Department of Public Welfare...."

196 Neb. at 95–96, 241 N.W.2d at 526–27.

The import of the Nebraska case is that public employees must select the governmental entity which has the managerial authority to control the terms of employment over which the employees seek to negotiate. One commentator has stated this basic principle of labor law as follows:

"First, there is frequently in the public sector a problem in locating a clearly defined locus of management authority, i. e., in determining who is the public 'employer', both for the negotiation and the administration of an agreement. Ideally, in order to best promote stable management-labor relationships, the bargaining unit should have real correlation with ultimate management authority. The absence of such clearly defined authority often leads to frustration and instability in labor relations." (Footnotes omitted.)

9 Kheel, *Labor Law* § 43.03, at 43–39 to 43–40 (1979); *see also*, Kheel, *supra*, § 43.-04[3][c].[3] The consequence of the failure of public employees to identify the "locus of management authority" is well-illustrated by the recent case of *Fort Wayne Patrolman's Benevolent Association, Inc., v. City of Fort Wayne* (1980), Ind.App., 408 N.E.2d 1295, *rehearing denied with opinion*, Ind. App., 411 N.E.2d 630 (transfer pending). In that case, the city successfully disaffirmed a collective bargaining agreement negotiated by the mayor of the city with the bargaining representative of city police officers. The agreement established a wage plan and other terms of employment for police officers. The court held that the mayor was not empowered to bind the city to such an agreement because "the Common Council controlled the purse strings for the police department, and the Board of Public Safety retained ultimate management control over departmental affairs." 411 N.E.2d at 632. The authority to negotiate the terms of employment covered in the agreement was delegated by statute to governmental entities other than the mayor. Thus, the agreement was unenforceable.

Like the mayor in *Fort Wayne PBA, supra*, the Lake County Welfare Department singularly lacked managerial authority over the terms of employment which were to be the subject of negotiations. After the AFSCME, AFL–CIO, Council 62, had been certified as the bargaining representative of the employees of the Lake County Welfare Department, the union submitted its "Collective Bargaining Proposals" (Defendants' Exhibit "H"), which encompassed the terms of employment over which the union intended to negotiate. An examination of the union's proposals reveals that the union intended to negotiate terms of employment which were beyond the managerial authority of the Lake County Welfare Department. For example:

(1) Under the heading of "Salaries," the union demanded:

---

**3.** *See also*, Edwards, "The Emerging Duty to Bargain in the Public Sector," 71 Mich.L.Rev. 885, 910–12 (1973); Wellington & Winter, "Structuring Collective Bargaining in Public Employment," 79 *Yale L.J.* 805, 861–64 (1970); Note, "The Civil Service-Collective Bargaining Conflict in the Public Sector: Attempts at Reconciliation," 38 *U.Chi.L.Rev.* 826 (1971).

"5. Every employee shall receive an increase in salary in the amount of one step on their anniversary date, irregardless [*sic*] of yearly evaluation. Anniversary date shall mean the date of initial employment with the agency."

This bargaining demand, if implemented, would have exceeded the authority granted to the Lake County Welfare Department. Under IC 4–15–2–11 and 30 IAC 1–4–1 *et seq.*, the authority to revise pay plans and grant salary increases is vested in the State Personnel Board and its Director.[4]

"(2) Under the heading of "Hours and Schedules," the union demanded:

"15. All employees shall be granted 1½ paid vacation days per month . . . .

.    .    .    .    .

"17. All employees shall be granted 1½ paid sick days per month."

This bargaining demand contravened the specific requirements of IC 4–15–2–29, 30 IAC 1–11–3(A), and 30 IAC 1–11–4(A). According to these regulations, vacation time and sick leave accumulate at a rate of one day per month of employment. (3) Under the heading of "Classification," the union demanded:

"3. In all cases of promotions, transfers, *decreases of forces* and recall after layoff, length of continuous service shall prevail."

This bargaining demand as it related to decreases of forces failed to consider the specific requirements of IC 4–15–2–18(m) (Burns Code Ed., 1980 Supp.) (or IC 4–15–2–18(J) as it appeared in 1975). That statute requires any reduction in personnel in any state service to be based on "tenure of employment, military preference, length of service, and efficiency ratings." A reduction of personnel based

strictly on seniority is contrary to the statute cited above.

Based on these conflicts between the union's proposals and the state merit system as well as other conflicts not discussed, I must conclude that the union was not entitled to specific performance of the consent election agreement. Because the union intended to negotiate terms of employment which were regulated under the state merit system and beyond the managerial control of the Lake County Welfare Department, meaningful as well as lawful collective bargaining was an impossibility.

My interpretation of the legal issues in this case should not be construed as precluding any future bargaining between the Lake County Welfare Department and its employees should they decide to voluntarily negotiate again without state participation. The county welfare department may negotiate terms of employment over which they exercise managerial control, i. e., working conditions. However, if the county welfare department and its employees enter into such negotiations, then they must manifest an intent to comply with the state merit system guidelines established by statute and administrative regulation. This latter prerequisite did not occur in the present case.

I found it necessary to concur in result only because the majority opinion may be construed as holding that another voluntary consent election agreement may be enforceable if the parties overcome the contractual infirmities the majority found to exist in the present consent election agreement. Not all agreements to make agreements are unenforceable. An agreement to make an agreement is enforceable "if all the conditions of the contemplated agreement are specified." *Helvey v. O'Neill* (1972), 153

4. The diffusion of managerial authority over salaries complicates county-level welfare employees' ability to identify the controlling governmental entity. IC 1976, 17–1–24–18.1 (Burns Code Ed.) vests in the county council the power to establish salaries for county-level welfare employees, whereas IC 1976, 12–1–3–7 (Burns Code Ed., 1980 Supp.) assigns that duty to the county welfare board. *See, County*

*Council of Monroe County v. State ex rel. Monroe County Board of Public Welfare* (1980), Ind.App., 402 N.E.2d 1285. Regardless of which local governmental entity establishes the salaries, it is clear that both statutes mandate that county-level welfare employees "must be paid within the range of salaries established by the [State Personnel Board]." 402 N.E.2d at 1290.

Ind.App. 635, 646, 288 N.E.2d 553, 560. If the employees of the Lake County Welfare Department intend to seek a consent election agreement which contains the specific requirements of an enforceable contract, then they must identify the proper governmental entity with which to negotiate. Without the proper party, any collective bargaining agreement negotiated by the parties would be rendered a nullity.

For the reasons stated above, I would reverse the trial court's judgment.