341 F.2d 331
 NATIONAL TEA COMPANY, an Illinois Corporation, Plaintiff-Appellant,
v.
David WEISS, Parkview Foods, Inc., an Indiana Corporation, Edward P. Matuska, Margaret C. Matuska, his wife, Paul H. Vladika and Maryann L. Vladika, Defendants-Appellees.
 No. 14632.
 United States Court of Appeals Seventh Circuit.
 January 13, 1965.
 Rehearing Denied March 8, 1965.
 
 William Lederer, Chicago, Ill., Owen W. Crumpacker, Harold Abrahamson, Richard P. Komyatte, Crumpacker, Burbach & Abrahamson, Hammond, Ind., for appellant.
 Frank J. Galvin, Carl N. Carpenter, Hammond, Ind., for defendants-appellees Edward P. Matuska, Margaret C. Matuska, Paul H. Vladika and Maryann L. Vladika.
 Milton Roth, Joel Yonover, Gary, Ind., for defendants-appellees David Weiss and Parkview Foods, Inc.
 Before SCHNACKENBERG, KNOCH and KILEY, Circuit Judges.
 KNOCH, Circuit Judge.
 
 
 1
 Plaintiff-appellant, National Tea Company, brought this action for injunctive relief, damages, and specific performance of a written "Lease Agreement" with defendants, Edward P. Matuska, Paul H. Vladika and their respective wives. Defendants David Weiss and Parkview Foods, Inc., were charged with conspiracy with the other defendants to induce them to break the agreement and to lease the same realty to Parkview Foods, Inc.
 
 
 2
 The matter was submitted to the District Court on the issue of liability alone, other questions being reserved for later determination if the District Court should find liability.
 
 
 3
 The District Court found no liability and entered judgment dismissing the case. This appeal followed.
 
 
 4
 Plaintiff contends that the District Court erred as a matter of law in finding that the Lease Agreement was not an enforceable contract, and that the findings are against the undisputed evidence.
 
 
 5
 The Agreement provided for a term of ten years beginning August 1, 1959, plus several automatic extensions unless National Tea notified the lessors of its intention to cancel 90 days prior to the end of any term. Provision was made for an annual rental of $16,800 plus 1% of gross sales over a certain amount, not to exceed a total of $22,000. No rental at all was due until National Tea took possession or until six weeks from the date of certification by the architect or contractor that the premises were complete "in accordance with plans and specifications to be approved by lessee and lessor." The Agreement provided for lessors to construct a building 100 × 125 feet and a paved parking lot for National Tea and its customers to be roughly 16,600 square feet for about 54 automobiles.
 
 
 6
 Construction was to begin on or before February 1, 1959, on penalty of having the lease agreement cancelled on 30-days' notice if construction did not begin within 30 days after the date of the notice. Provision was made for extensions of time should circumstances beyond control of lessors prevent completion by August 1, 1959. The agreement also stated that:
 
 
 7
 "[R]egardless of the cause of delay, whether within or beyond the control of the lessor, if the premises are not completely constructed by the first day of November, 1959, lessee shall have the option to cancel this lease at any time thereafter prior to lessee's actual acceptance of the premises by giving written notice to the lessor of such cancellation."
 
 
 8
 On October 13, 1958, the Agreement which was originally prepared on National Tea's forms, was signed by lessors, whose attorney, Walter J. Keckich, sent it to National Tea with a letter stating that the Agreement was signed subject to further conditions including the following:
 
 
 9
 "1. That the lessee would furnish its own lighting fixtures for the building to be constructed.
 
 
 10
 "2. The lessee would furnish air conditioning equipment for the building.
 
 
 11
 "3. That the building to be constructed should not cost more than $125,000.00, and that the lessee would assist the lessor in procuring financing of the building from an independent financial institution at an interest rate not to exceed five and one-half percent.
 
 
 12
 "4. That the lessee would have its Board of Directors prepare resolutions authorizing the officers to execute the lease on behalf of the lessee and that plans and specifications for the construction of the building would be submitted to the lessor in a reasonable time to afford the lessors an opportunity to submit same to prospective contractors for bids and have the building built in the time prescribed by the lease."
 
 
 13
 Early in December, 1958, National Tea sent the Agreement back to Mr. Keckich signed by National Tea's officers. Mr. Keckich wrote again in December and twice in January, 1959, for approval of the conditions in his letter of October 13, 1958, and for submission of plans and specifications. Not until March 4, 1959, did Mr. Keckich receive a letter from the head of National Tea's construction department with mechanical plans and specifications (except for electrical plans and specifications to be forwarded later). These mechanical plans were to be used by Joseph P. Martin, lessors' architect in making the plans and specifications for construction of the actual building.
 
 
 14
 On March 10, 1959, National Tea replied to the October 13, 1958, letter stating that National Tea would furnish its own air conditioning and its own lighting fixtures, the former to remain National Tea's property and the latter to remain in the building; that lessors' expenditures for the improvements were not to exceed $125,000; that a mortgage loan in this amount could be procured at interest not to exceed 5¾%; and adding that resolution of the Board of Directors authorizing the officers to execute the Agreement for National Tea had not yet been received but would be obtained and forwarded.
 
 
 15
 Mr. Martin completed plans in April, 1959, and submitted them to Dodge Reports requesting bids be submitted for opening on May 16 or 18, 1959.
 
 
 16
 Although National Tea examined the plans and specifications to determine whether they were over designed and made certain changes in them, the District Court found that there was no actual approval of the plans and specifications by National Tea.
 
 
 17
 The low bid received was $135,074, which was $10,000 in excess of the fixed maximum for construction. Mr. Martin proposed changes in the plans and about May 25, 1959, the low bidder reduced his bid to about $124,000 which would have fallen within the fixed maximum. Although the proposed changes were submitted to National Tea, no approval was ever given, nor was any extension of the completion date made. National Tea states that no request for such extension was made.
 
 
 18
 The District Court found that the lessors met with David Weiss and advised him of their displeasure over their dealings with National Tea, asked him if he would be interested in leasing their property for Parkview Foods at $2,000 per month, and in arranging financing for construction of a building for Parkview Foods' use. Later Mr. Weiss did arrange such financing. Still later, he and his attorney met with Mr. Matuska and his attorney. The District Judge found that Mr. Weiss was assured that the Matuskas and Vladikas were free to negotiate with Mr. Weiss. Mr. Weiss's own attorney made a search of the records of Lake County, Indiana, and found no lease between the Matuskas and Vladikas and National Tea on record. On or about June 19, 1959, a preliminary lease agreement with Mr. Weiss was signed and on June 22, 1959, Mr. Keckich wrote National Tea that the Matuskas and Vladikas considered the Agreement with National Tea to be terminated. Among other items, he referred to the delay in furnishing plans and specifications and the resultant inability to start construction on time, with no chance of timely completion, inability to finance the construction for $125,000, and lack of Directors' resolution authorizing National Tea's officers to sign the Agreement. No answer to this letter was received.
 
 
 19
 Meanwhile the real estate broker who represented the Matuskas and the Vladikas in their original dealings with National Tea was told that these negotiations were terminated and that they were now dealing with Mr. Weiss. The real estate broker transmitted this notice to National Tea.
 
 
 20
 On July 6, 1959, Mr. Keckich again wrote National Tea referring to his letter of June 22, 1959. In mid-July Mr. Matuska, Mr. Vladika and Mr. Weiss met with Mr. Martin, the architect, to discuss a super market building to be leased to Parkview Foods. A few days later, July 22, 1959, plaintiff had its October 15, 1958 Agreement recorded even though it was not acknowledged as required for recordation under Indiana law. Burns Indiana Statutes, § 56-123.
 
 
 21
 On July 24, 1959, National Tea wrote Mr. Keckich stating that there was no reason to cancel the Agreement, that attempts to reduce the costs were proceeding, that there were several contractors who might be hired to construct the building for less than the agreed figure, and that National Tea was not concerned about the February 1, 1959, date for starting construction, but would like construction to begin before year's end. Further, a meeting with Mr. Martin and National Tea's construction department was suggested to go over plans and specifications. Mr. Keckich replied to this letter referring (1) to a prior telephone conversation in which he had been informed that a memorandum was in preparation at National Tea suggesting that the deal relating to the Lease Agreement be dropped, and (2) to his own letter advising that the Agreement was terminated.
 
 
 22
 A building was subsequently built and occupied by Parkview Foods, Inc. During the course of construction, on October 22, 1959, counsel for National Tea sent the following letter to the Matuskas, the Vladikas, Mr. Weiss, and Parkview Foods:
 
 
 23
 "We represent the National Tea Company which entered into a lease on October 15, 1958 with Mr. and Mrs. Matuska and Mr. and Mrs. Vladika.
 
 
 24
 "After the lease was executed, Mr. and Mrs. Matuska and Mr. and Mrs. Vladika attempted to cancel the lease into some sort of arrangement with the Parkview Foods, Inc.
 
 
 25
 "National Tea Company now demands that Mr. and Mrs. Matuska and Mr. and Mrs. Vladika proceed to comply with the terms of the lease agreement which they entered into with National Tea Company. Demand is also made upon Mr. David Weiss and/or the Parkview Foods, Inc. to cease and desist from attempting to interfere with the contractural rights of the National Tea Company and said lease.
 
 
 26
 "Unless we receive assurance within seven days that the building will be built for the National Tea Company as required by the lease, we will file suit for specific performance and damages against all of you."
 
 
 27
 National Tea's demands were not satisfied and this suit was brought in the District Court.
 
 
 28
 As the District Judge ruled, the first question is whether or not a valid enforceable agreement existed between National Tea and the Matuskas and Vladikas.
 
 
 29
 Obviously, the building to be constructed was a vital aspect of the Agreement. National Tea had no interest in, and never intended to pay rent for, the unimproved land. Yet the Agreement specified only the external dimensions of the proposed building, all other essential items being left for future agreement between the parties.
 
 
 30
 The parties may be said to have agreed to make an agreement, but such an agreement is unenforceable in the courts. Wallace v. Mertz, 86 Ind.App. 185, 191, 156 N.E. 562 (1927). Until the parties agreed on the fundamental and material items basic to the agreement, there was no enforceable contract. Risk v. Thompson, 237 Ind. 642, 648, 147 N.E.2d 540 (1958).
 
 
 31
 Under the guise of construction, the District Court could not itself write a contract for the parties covering the missing essential elements. Puetz v. Cozmas, 237 Ind. 500, 507, 147 N.E.2d 227 (1958).
 
 
 32
 Although there were some tardy dealings with plans and specifications, plaintiff never did approve them. Plaintiff argues that approval can be inferred from its failure to object to the plans as drawn up by Mr. Martin and from its insertion of only minor corrections, but even after notice that the Matuskas and Vladikas considered the Agreement at an end, Mr. Curto of National Tea's real estate department wrote Mr. Keckich, not offering to approve the plans and specifications as they then stood, but seeking a meeting between National Tea's construction department and Architect Martin to go over the plans and specifications to see if they were acceptable.
 
 
 33
 Plaintiff contends that the defendants made formal approval impossible by their negotiation of another agreement with Mr. Weiss and Parkview Foods. How long were the Matuskas and Vladikas obliged to wait? In his letter of July 30, 1959, which was defendants' Exhibit E & P12, Mr. Keckich wrote National Tea:
 
 
 34
 "[T]he building was to be completed not later than August 1, 1959, and this was an impossibility in view of the developments that were caused by the lessee. You know that it is not reasonable to expect that the lessors would proceed with the building with the kind of plans which you submitted and also when the written contract or lease would require the building to be built within the next five or six days.
 
 
 35
 "The lessors have lost considerable money as a result of the failure of the lessees to furnish plans and specifications on time and etc. Ordinarily during the year the lessor rents the premises for a drive-in and it is my understanding that this year they did not lease the premises during the summer because of the agreement with National Tea Company."
 
 
 36
 We agree with the District Judge that no enforceable contract existed between National Tea Company and the Matuskas and Vladikas. We are also in accord with his opinion that it was unnecessary to consider the other issues which depended on the existence of an enforceable lease. Grimm v. Baumgart, 1951, 121 Ind.App. 626, 632, 96 N.E.2d 915, 97 N.E.2d 871, cited with approval in Bailey v. Banister, 10 Cir., 1952, 200 F. 2d 683, 685.
 
 
 37
 The judgment of the District Court is affirmed.
 
 
 38
 Affirmed.