**KINKO'S GRAPHICS CORPORATION, Plaintiff,**

v.

**Earl C. TOWNSEND, Jr., Townsend & Townsend, and the Charles E. Larman Co., Defendants.**

No. IP91–1332–C.

United States District Court, S.D. Indiana, Indianapolis Division.

Sept. 30, 1992.

William Barnard, R.C. Richmond III, Sommer & Barnard, Indianapolis, Ind., for plaintiff.

Charles W. Symmes, Ober Symmes Cardwell Voyles & Zahn, Dennis N. Owens, John H. Douglas, Smith Maley & Douglas, Indianapolis, Ind., for defendants.

BARKER, District Judge.

## ENTRY

Kinko's Graphics Corporation ("Plaintiff") moves the Court for an order of prejudgment possession against Earl C. Townsend, Jr. ("Townsend") and Townsend & Townsend (collectively, "Townsends"). Plaintiff is the owner of a building (the "real estate") located at 150 East Market Street, Indianapolis, Indiana. Townsends presently occupy the second floor of the real estate pursuant to a purported oral lease, in addition to a portion of the first floor which was never the subject of any negotiations between the parties. For the reasons set for below, Plaintiff's motion is granted.

## BACKGROUND

In November, 1990, Plaintiff purchased the real estate that is the focus of this dispute for $750,000 from the Great Lakes Bank Corporation. *See* Niemann Deposition, at 7–8, 11–12. Shortly after that transaction was complete, Plaintiff hired The Charles E. Larman Co. ("Larman") to find tenants to occupy the second floor. David Niemann ("Niemann") is an independent contractor who works as a real estate salesman for Larman, and was involved in the sale of the real estate when it was purchased by Plaintiff. Niemann was retained to assist Plaintiff in finding prospective tenants.

Sometime in December, 1990, or January, 1991, Townsend contacted Niemann concerning the terms of a lease for the second floor of the real estate. Niemann met Townsend and his son, Earl Townsend, III, for lunch at a local restaurant to discuss requirements for the lease. *See* Niemann Deposition, at 29. At that time, Niemann informed Townsend that the property listed for $11.50 per square foot and that there were approximately 5,000 square feet available. *See id.*, at 29–30.

On May 15, 1991, Townsend made a proposal to lease the real estate for $2,000 per month. *See id.*, at 35–36. Niemann specifically requested that Townsend put his offer in writing, *see* Townsend Deposition, 4–21–92, at 27, and the resulting proposed lease, which pertained to the second floor only, was to become effective August 1, 1991, for two years with a rent of $2,000 per month. *See* Townsend Exhibit A. No mention was made of utilities. Townsend then asked Niemann to send the proposal to Plaintiff for its review. *See* Townsend Deposition, 4–21–91, at 38. Townsend's offer was rejected, although Niemann later informed Townsend by phone that Plaintiff would approve a lease for $2,200 for a two year term with Townsend to pay utilities.[1] *See* Niemann Deposition, at 68. Townsend then indicated that he would increase his offer to $2,100 per month for two years and pay his share of the utilities. *See id.*, at 69.

On May 31, 1991, Townsend contacted Niemann for an update on the progress of negotiations with Plaintiff. Townsend informed Niemann that he was seeking to finalize an agreement in short order because he was leaving for his cabin in Michigan for three months. *See id.*, at 70. He

---

1. Representatives of Plaintiff allege that Niemann was not instructed to make a counteroffer to Townsend, and that plaintiff conducted no further discussions with Niemann regarding Townsend. *See* Affidavit of David Nassau, ¶ 4; Affidavit of John Tremolis, ¶ 4; Affidavit of Gregory S. Bloom, ¶¶ 5–7. Niemann testified, however, that he was later contacted by Plaintiff or its representatives and that Plaintiff had changed its position and was willing to take less than what the listing agreement required. *See* Niemann Deposition, at 66–67.

again indicated to Niemann that he was willing to pay $2,100 per month, and requested that Niemann send him something via FAX indicating a "positive response." *Id.*, at 70. Niemann complied with Townsend's demand for a FAX, and sent him the following message: "Agreement is effective per verbal communication with Kinko's Graphic Corp. Details to follow. Thanks, David." Townsend Exhibit D, 4–22–92. Niemann also allegedly advised Townsend that the FAX would be followed by a binding, written lease.[2] *See id.*, at 71. This was Townsend's understanding as well; he testified that he understood "Details to follow" to mean that Niemann would forward a written lease. *See* Townsend Deposition, 4/21/92 at 47–48. Niemann, however, also contends that "Details to follow" meant that the parties still had to finish negotiations over several key terms, including the lease amount. *See* Niemann Deposition, at 73. Niemann testified that as of May 31, 1991, the parties were one-hundred (100) dollars apart on monthly rent, and no agreement had been reached on utilities. *See id.*, at 74.

Following these communications, Townsend mailed a check for $2,100 to Larman's offices; the check was dated May 31, 1991, and included a notation: "Rent second floor 150 E. Market St." *See* Townsend Exhibit E. Niemann testified that the check was considered earnest money, or a deposit, and that he was instructed by Plaintiff to hold it until a lease agreement was complete.[3] *See* Niemann Deposition, at 42, 45. Townsend then secured the keys to the real estate the same day from Lejo Harmeson ("Harmeson"), an officer of BanCorp, which occupied part of the real estate's first floor. Niemann testified that Harmeson phoned him and asked whether there was a lease for Townsend and whether he could turn the keys over to him. Niemann responded that there was no lease, but that Townsend could have the keys because it was his understanding that Townsend wanted to inspect the premises over the weekend with his son or law partner. *See* Niemann Deposition, at 48–49. Niemann believed that Townsend was going to return the keys when he had finished his inspection. *See id.*, at 49. Unbeknownst to Niemann, however, Townsend kept the keys and began making renovations to the real estate and moving materials into the second floor. Several weeks later, Townsend phoned an attorney from his cottage to determine the validity of oral leases in Indiana. *See* Townsend Deposition, 4/28/92, at 33.

Nothing further transpired between the parties until mid-July, when Niemann sent to Townsend at his Michigan summer cottage a written proposed lease for the second floor of the real estate. *See* Plaintiff's Exhibit A. The lease provided for a monthly rent of $2,200, which Townsend modified to $2,100 per month, and added the language "Landlord pays real estate taxes and landlord's insurance." Townsend then returned the lease to Larman on or about July 30th. By mistake, Niemann included a clause, number 18, regarding utilities, which stated that the tenant would pay utilities over $1,800 per month. *See* Niemann Deposition, at 85.

In early August, by way of an article in the Indianapolis Business Journal, *see* Plaintiff's Exhibit 1, Niemann learned to his surprise that Townsend was occupying the premises. *See* Niemann Deposition, at 56, 89–90. Shortly thereafter, Niemann confronted Townsend's son outside the premises and told him that there was no lease agreement, and that the Townsends

---

**2.** The following series of questions from Niemann's deposition on April 22, 1992 highlight this point:

Q Did you understand that Kinko's required that any lease be subject to its approval of a written lease?
A Yes.
Q Did you make that known to Mr. Townsend?
A Yes.

Q And, again, to the extent you recall, how would you have made that known to Mr. Townsend?
A I made that known to Mr. Townsend the day I sent the fax that this was all subject to a final lease agreement in writing.

**3.** Plaintiff denies that there were any further discussions with Niemann regarding Townsend after Townsend's May 15, 1991 proposal was rejected, *supra.*

should not remove a lease sign which he had affixed to a first floor window. *See id.*, at 99.

On August 14, 1991, Niemann sent the lease to Plaintiff in California along with a cover letter which indicated that Townsend had already moved in and had incurred numerous expenses relating to plumbing and elevator problems. *See* Plaintiff's Exhibit 8. Plaintiff rejected the proposed lease. On or about August 21st, a conversation occurred between Wayne Fairbanks ("Fairbanks"), an attorney for Plaintiff, and Townsend in which the latter complained that Niemann was trying to get an extra one-hundred (100) dollars per month in rent. *See* Affidavit of Wayne M. Fairbanks, at ¶ 4. Fairbanks agreed to look into the matter and was later advised that Plaintiff would accept a month-to-month tenancy at $2,200. When Fairbanks conveyed this information to Townsend, Townsend responded by claiming that he had an oral lease with Niemann. *See id.*, at ¶ 6.

On September 11, 1991, Fairbanks again offered Townsend a month-to-month tenancy at $2,200 per month, which Townsend rejected. *See id.*, at ¶ 9. The next day, Fairbanks sent Townsend a letter demanding that he vacate the premises. *See* Plaintiff's Exhibit B. The letter stated: "In the event that you [Townsend] send a check to [Plaintiff] for $2,200, [Plaintiff] will cash that check as rent for August, 1991." *See id.* Townsend received this letter on September 19, 1991, as shown by a letter from Townsend to Larman dated September 20, 1991. *See* Plaintiff's Exhibit C. On September 25, 1991, Townsend sent directly to Plaintiff a check for $2,100 for October rent, along with a cover letter which claimed that it was sent pursuant to Fairbank's instructions even though it was not the same amount that Fairbanks had mentioned in his earlier letter. *See* Plaintiff's Exhibit D. Plaintiff inadvertently cashed the check. Fairbanks responded with a letter to Townsend on October 3, 1991, where, not surprisingly, he claimed that Townsend had "knowingly created a false impression by stating that this check was sent to [Plaintiff] pursuant to my instruction...." *See* Plaintiff's Exhibit C. A

check for $2,100 subsequently was sent to Townsend on October 16, 1991. *See* Plaintiff's Exhibit F. Plaintiff also returned Townsend's check of May 31, 1991. *See* Plaintiff's Exhibit 9.

Townsend claims to have incurred nearly $50,000 in expenses related to his move. *See* Townsend Exhibit 4. Plaintiff, in contrast, has submitted sworn testimony that from July, 1991 to October, 1991, an agreement was in the offing to sell the real estate for $1,150,000, but because Townsends were there, the deal did not proceed to closing. *See* Affidavit of David B. Douds, at ¶ 6.

This litigation commenced when Plaintiff filed its complaint against Townsends for recovery of the real estate, declaratory judgment, and unlawful possession, and against Larman for negligence and disobeying instructions. In their answer, Townsends raise the affirmative defense of ratification (*i.e.* that by cashing Townsend's check of September 25, 1992, Plaintiff ratified the lease attached to Plaintiff's complaint as Exhibit A, and is now estopped from denying the same). Larman offers two affirmative defenses: (1) that there was no written agreement as contemplated by all parties, and that the terms of any parol agreement were obtained by the intentional and/or negligent conduct of Townsends; and (2) that Plaintiff incurred the risk and was at fault. Townsends also have filed cross-claims against Larman, and counterclaims against Plaintiff. Pursuant to Fed.R.Civ.Proc. 12(b)(6), Plaintiff seeks to dismiss Count I of Plaintiff's counterclaim, which alleges a violation of Rule 11 of the Federal Rules of Civil Procedure. This entry, however, only addresses Plaintiff's request for prejudgment possession of the real estate.

## DISCUSSION

Under the laws of Indiana, this Court may order the ejectment of Townsends from the real estate provided that it is satisfied "with reasonable probability" that Plaintiff "is entitled to possession, use, and enjoyment of the property, pend-

ing final adjudication of the claims of the parties." [4] *See* Ind. Code § 32–6–1.5–5 (Burns 1980). "A reasonable probability is a probability sufficient to undermine confidence...." *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984). Applying this standard, the Court finds that Plaintiff is entitled to the prejudgment possession of the real estate.

 Townsends presently occupy the second floor of 150 East Market Street, in addition to a portion of the first floor. The gravamen of Townsend's argument as to the legal origin of his tenancy on the second floor is that an oral contract was formed on May 31, 1991. If that contract does not exist, then he probably has no basis under law for occupying the second story because it appears that the parties did not enter into any other contract subsequent to May 31, 1991. A requirement for any valid contract in Indiana is a "meeting of the minds," *see Indiana Service Corp. v. Town of Flora,* 218 Ind. 208, 31 N.E.2d 1015 (1941), and between these parties it seems highly unlikely that any agreement was reached after May 31st, given the intensity of their squabbling throughout the summer of 1991 over their respective rights in the real estate. In terms of the first floor, Townsend offered a questionable justification for his occupation of the premises: that he had decorated the same space sixteen (16) years ago.[5] *See* Townsend Deposition, 4/21/92, at 40; Townsend

Deposition, 4/28/92, at 6. Niemann testified that there was never any discussion about rental of the space on the first floor. *See* Niemann Deposition, at 65.

In deciding whether there is a reasonable probability that Plaintiff is entitled to possession of the real estate, the Court employs a two-fold inquiry. The first question that must be addressed is whether the parties intended not to be bound until a writing was executed. If, from the course of their dealings, it appears that they desired only to be bound once the words of the agreement were plainly before them in writing, then that intent controls and Townsend's argument that an oral contract existed would be of no consequence. If, however, an agreement was concluded before the writing was executed, then the Court would have to reach the second prong of the analysis: whether the oral agreement itself met the requirements for a valid contract under the laws of Indiana?

From the record before it, the Court has little difficulty determining that the parties probably manifested an intent to enter into a contractual relationship only after a writing was executed, and even assuming *arguendo* that such a conclusion made no difference, Plaintiff still could reasonably be expected to prevail in its attack on the sufficiency of any purported oral lease.

It should come as no surprise that the nature of the dispute between these parties is not wholly uncommon, and that other

4. The full text of the prejudgment provision reads:

> **Prejudgment order of possession—Appointment of receiver.**—Upon the hearing on the order to show cause, the court shall consider the showing made by the parties appearing, and shall make a preliminary determination which party, with reasonable probability, is entitled to possession, use, and enjoyment of the property, pending final adjudication of the claims of the parties. If the court determines that the action is one in which a prejudgment order of possession in plaintiff [sic] favor should issue, it shall issue such an order. If the property claimed by the plaintiff has a peculiar value, that cannot be compensated by damages, the court may, in lieu of an order of possession, appoint a receiver to take possession of an hold the property until further order of the court. If the defendant fails to

appear the court may issue the prejudgment order of possession.

Ind.Code § 32–6–1.5–5 (Burns 1980).

5. Townsend's rationale for occupying the first floor is revealing. His use of a part of the lower level evidently was not discussed in any of the negotiations, but somehow he apparently believes that he is entitled to its possession by the mere fact that he was able to present Plaintiff with the *fait accompli* of occupation. He now assumes that the law will rush to his rescue even though he presents no substantive legal basis for his act. It is beyond belief that a lawyer with so many years of experience in the courts of this state could offer such a justification, and then with a straight face argue to the court that his conduct as concerns his lease of the second floor was not tainted by the same poor judgment.

courts have had ample opportunity to develop a time-honored jurisprudence in response to facts similar to those now before the Court. The genesis of these misunderstandings is easy to identify: after long negotiations one party shouts, "Its a deal!", only to discover some months later, and probably after taking some act in reliance, that the subsequently drafted contract is at odds with what was stated verbally. Nearly one-hundred years ago, Maine's Supreme Court articulated what has become the prevailing rule of law:

> If the party sought to be charged intended to close a contract prior to the formal signing of a written draft, or if he signified such an intention to the other party, he will be bound by the contract actually made, though the signing of the written draft be omitted. If on the other hand, such party; neither had nor signified such an intention to close the contract until it was fully expressed in a written instrument and attested by signatures, then he will not be bound until the signatures are affixed.... [I]n other words: if the written draft is viewed by the parties merely as a convenient memorial, or record of their previous contract, its absence does not affect the binding force of the contract; if, however, it is viewed as the consummation of the negotiation, there is no contract until the written draft is finally signed.

*Mississippi & Dominion S.S. Co. v. Swift,* 86 Me. 248, 29 A. 1063, 1066–67 (1894), *cited by,* E. Allen Farnsworth, Contracts § 3.8 (1982). Indiana courts have adopted the same principle. *See, e.g., International Shoe Co. v. Lacy,* 114 Ind.App. 641, 53 N.E.2d 636, 638 (1944) ("There is no binding contract where, although its terms have been orally agreed upon, the parties have also agreed that they shall not be bound until the same shall have been reduced to writing, (citation omitted), but where they assent to all of its terms, the mere reference to a future contract in writing will not negative the existence of a present and completed one."); *see generally Gruen Industries, Inc. v. Biller,* 608 F.2d 274, 280 (7th Cir.1979), *citing,* 1 A. Corbin, Contracts § 30 at 97 (1973 ed.) ("It is well settled that no contract is formed 'where two parties consider the details of a proposed agreement, perhaps settling them one by one, with the understanding during this process that the agreement is to be embodied in a formal written document and that neither party is to be bound until he executes the document.' ").

■ In the absence of an explicit agreement, the Court must discern with reasonable probability what the parties' intent was regarding the significance of any contemplated writing. Indiana, like most states, takes an objective view of "intent" in contract disputes. *See, e.g., Holloway v. Giganti, Inc.,* 540 N.E.2d 97, 99 (Ind.App. 1 Dist.1989) ("The intent relevant in contract matters is not the parties' subjective intents but their outward manifestation of it."). In making this assessment, courts typically consider not only the parties' communications but also the circumstances of the transaction itself. Whether it is reasonable to expect an agreement to be reduced to writing depends in part on the sophistication of the parties and the kind of bargain that is negotiated. Thus, in *Ryan v. Schott,* 109 Ohio App. 317, 159 N.E.2d 907 (1959), the court found no contract where the parties failed to execute a written agreement for the sale of all the stock of a small company which had a building as its only asset. Like the present case, the disagreement between the parties originated when one side believed that an agreement had been reached after both sides shook hands, though no writing had yet occurred. The court framed its inquiry in the following terms: "There is but one issue in the case, and that is an issue of fact only, and that is whether the conduct of the parties, including the language used by them under the surrounding circumstances, indicates that they had bound themselves to the purchase and sale of the stock in question." *Id.,* 159 N.E.2d at 908. In finding that the objective intention of the parties was to enter into a contract only after a writing had been executed, the court looked to two factors: (1) the contract's subject matter ("They were negotiating with reference to a large office build-

ing...."); and (2) the sophistication of the parties and that each was represented by a lawyer. *Id.*, 159 N.E.2d at 908.

Given the foregoing analysis, the Court must first determine whether there likely was an explicit agreement between the parties for a lease of the premises. Townsend claims that Larman's FAX on May 31st was sufficiently definite to induce his detrimental reliance on it; he believed that an agreement had been reached. But would it be reasonable to conclude that this is how these parties, one a lawyer and the other a professional real estate agent, would conclude such a transaction? Probably not. These were sophisticated individuals who had negotiated for an extended duration over the lease of prime real estate in the heart of Indianapolis.

■ If it seems implausible that a few scribbled lines on a FAX would lead a reasonable party to believe that Townsend was licensed to take the actions that he ultimately took, the possibility is even more remote that the FAX embodies the terms of their compact. These circumstances indicate that if the FAX was anything, it probably was little more than an agreement to agree. *See, e.g., Soroka v. Knott,* 90 Ind.App. 649, 168 N.E. 703, 705 (1929) ("An instrument or contract will be construed a lease or only an agreement for a lease, according to what appears to have been the paramount intention of the parties as such intent may be collected from the whole tenor and effect of the instrument.").

In Indiana, agreements to agree are not enforceable.[6] *See Wallace v. Mertz,* 86 Ind.App. 185, 156 N.E. 562 (1927); *see also National Tea Co. v. Weiss,* 341 F.2d 331, 334 (7th Cir.1965) ("The parties may be said to have agreed to make an agreement, but such an agreement is unenforceable in the courts.").

Townsend also argues that there was an oral lease. The facts, though, indicate that the objective intent of the parties probably was to the contrary: a writing was anticipated from the outset of their negotiations. Niemann testified that he informed Townsend that any agreement would have to be approved by Kinko's. *See* Niemann Deposition, at 76. Setting aside any contention that he was remiss in telling Townsend that this agreement had to be in writing, what else could a reasonable person have thought? Plaintiff is a very large corporation with offices and property throughout the entire nation. Can anyone seriously argue that such an enterprise would leave its affairs to the vagaries of oral agreements? But this wasn't Niemann's testimony. He stated that he told Townsend that the agreement had to be approved by Kinko's *and* had to be in writing. *See id.* The nature of the parties and the kind of transaction contemplated indicate that only

---

6. For a general discussion of agreements for leasehold estates, *see* 49 Am.Jur.2d *Landlord and Tenant* § 18, at 60–61 (1970):

There is a marked distinction in both the rights and liabilities of the parties between a lease and a mere agreement for a lease. The question whether an agreement is a lease or an agreement for a lease depends upon the intent of the parties, as manifested by that agreement. As a general rule, where the agreement contemplates the execution of a formal lease at a future time, especially where its future execution is conditional, the agreement is one for a lease, and not a lease itself; where, however, an instrument contains apt words of present demise, and the estate granted and the terms of the demise are definite and explicit, it has frequently been held a present demise as distinguished from an agreement for a lease, although it also contains a provision or covenant for the execution of a more formal lease at a future time....

An agreement of the owner to enter into a lease may be implied from a written proposition by another to lease his property, which is signed by such owner. Also, a valid agreement for a lease may be made, as in case of other contracts, by correspondence; in such case the question always is, did the parties mean to contract by their correspondence, or were they only settling the terms of an agreement into which they proposed to enter after all its particulars were adjusted, which was then to be formally drawn up and by which alone they designed to be bound? Where the latter is the case, there is no binding agreement.

To be binding, an agreement for a lease must be certain as to the terms of the future lease; if it shows on its face that other details are to be settled between the parties it is not binding unless such details are settled between the parties.

a written instrument probably was likely to suffice as the lease agreement.

The parties' other behaviors also reveal that their intent likely was not to rely on oral promises. Niemann insisted that Townsend put his lease proposal of May 15, 1991 in writing, *see* Townsend Deposition, 4/21/92, at 27, and Townsend insisted that Niemann send him a FAX on May 31, 1991, because, in his own words, "Now, I want something in writing." Townsend Deposition, 4/28/92, at 28. And by Townsend's own admission, the phrase "Details to follow" in the Niemann's FAX meant that a written lease would be sent for his signature. *See* Townsend Deposition, 4/21/92 at 47–48. Of course, the lease was then sent to Plaintiff for its approval. It also seems that an experienced lawyer would check the legal validity of oral leases before entering into one, but such was not the case with Townsend. He only consulted counsel on this matter after he had taken up residence in Michigan for the summer, long after the oral lease allegedly came into being. *See* Townsend Deposition, 4/28/92, at 33.

Townsend, though, insists that an agreement was reached on May 31, 1991, before any lease was drafted. With the exception of the rent amount, the terms of this purported lease are unclear, however. Niemann testified that other terms still had to be negotiated after that date. *See* Niemann Deposition, at 73–74. When Townsend was asked about the terms of the oral lease, he couldn't identify them but insisted that they were "voluminous". *See* Townsend Deposition, 4/21/92, at 47. Instead, he referred to written documentation for guidance. *Id.* It would seem that if an oral lease actually came into being, then both parties should be able to identify its terms, and that Townsend especially should be able to do this without reference to written materials. Instead, there doesn't appear even to have been a meeting of the minds concerning when Townsend could move in. Townsend testified that the lease began on September 1, 1991, *see* Townsend Deposition, 4/21/92, at 51, but that his son had been moving things in during August. *Id.* at 60. Niemann of course visited the premises in August and confronted the younger Townsend, and told him to stop removing the lease sign from the window. *See* Niemann Deposition, at 99.

■ The apparent lack of any agreement over the material terms of the purported lease is a fatal flaw for Townsend's cause. For even if the objective intent of the parties as concerns the importance of a written instrument is set aside, the alleged oral lease would still fail because it lacked the mutual assent of the parties—a requisite for a valid contract in Indiana. *See Town of Flora, supra; see also Wagoner v. Joe Mater and Assoc., Inc.,* 461 N.E.2d 706, 708 (Ind.App. 3 Dist.1984) (holding that both express and implied contracts involve a "meeting of the minds" and that the only difference is "that in an express contract the intent of the parties in evidenced by spoken words or by a writing, while in an implied contract the intent of the parties is evidenced by their conduct.").

■ Having determined that the parties likely intended to reduce the lease to writing and that any oral lease they may have entered into would fail on its own terms, the Court need only address two remaining issues. The first is Townsend's affirmative defense that by cashing the check Plaintiff is now estopped from denying that a lease was created. In Indiana, there are five facts which give rise to estoppel: (1) a representation or concealment of material facts; (2) the representation must have been made with knowledge of the facts; (3) the party to whom it was made must have been ignorant of the matter; (4) it must have been made with the intention that the other party should act upon it; and (5) the other party must have been induced to act upon it. *See State ex rel. Crooke v. Lugar,* 171 Ind.App. 60, 354 N.E.2d 755, 765 (2 Dist.1976). In a manner of speaking, it appears the "shoe is on the wrong foot" as concerns the concealment of material facts and the matter of Plaintiff's cashing Townsend's check. Plaintiff's counsel informed Townsend that "in the event that you send a check to [Plaintiff] for *$2,200.* [Plaintiff] will cash that

check as rent for August, 1991." (emphasis added). *See* Plaintiff's Exhibit B. Townsend sent a check for *$2,100* to Plaintiff's offices and stated that it was sent pursuant to the instruction of Plaintiff's counsel. *See* Plaintiff's Exhibit B. The conduct speaks for itself.[7] Should Townsend succeed with his affirmative defense, he probably would not be entitled to continue his occupation of the real estate in any event because money damages would in all likelihood compensate him for the harm he incurred.

The second and final matter concerns the requirement pursuant to Ind.Code § 32–6–1.5–6 (Burns 1980) that Plaintiff file with the Court a "written undertaking" executed by a surety (*i.e.* a bond) sufficient "to assure the payment of such damages as the defendant may suffer if the property has been wrongfully taken from him." For this order allowing prejudgment possession to become effective, Plaintiff must make its filing within ten (10) days from the date of this entry, or seek an appropriate extension for good cause shown. Townsends will have five (5) days from the date Plaintiff makes the filing to contest the bond's sufficiency.

### CONCLUSION

Because it appears that there is a reasonable likelihood that Plaintiff is entitled to the possession of the real estate, Plaintiff's motion is GRANTED, and Townsends must vacate both the first and second floors of 150 East Market Street, Indianapolis, Indiana, within 30 days from the date Plaintiff posts a sufficient bond. Plaintiff must make a filing in accordance with Ind. Code § 32–6–1.5–6 (Burns 1980) within ten (10) days from the date of this entry. Townsends will have five (5) days from the date of Plaintiff's filing to respond.

It is so ORDERED.

---

7. The Court notes that under Indiana's Rules of Professional Conduct, a lawyer representing a client has a duty not to make false statements to third parties. Rule 4.1 states: "In the course of representing a client a lawyer shall not knowingly: (a) make a false statement of material fact or law to a third person; or (b) fail to disclose that which is required by law to be revealed."